## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 CR 345 |
| | ) | |
| v. | ) | Judge John F. Kness |
| | ) | |
| TIMOTHY MAPES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Timothy Mapes stands charged in a two-count indictment with perjury in violation of 18 U.S.C. § 1623(a) (Count One) and obstruction of justice under 18 U.S.C. § 1512(c)(2) (Count Two). Three pretrial motions by Defendant are presently at issue: a motion to strike surplusage from the Indictment ("Motion to Strike") (Dkt. 30); a motion for disclosure of *Brady*/*Giglio* material ("Motion for Disclosure") (Dkt. 31); and a motion to dismiss portions of Count One of the Indictment ("Motion to Dismiss") (Dkt. 33). For the following reasons, the Motion to Strike and the Motion to Dismiss are denied. Defendant's Motion for Disclosure will be addressed separately.

## I. BACKGROUND[1]

Defendant was Chief of Staff to Michael Madigan, the former Speaker of the Illinois House of Representatives. (Dkt. 1 ¶ 1.) Defendant resigned from the Chief of

---

[1] Unless otherwise noted, the following facts are undisputed for the purposes of this opinion.

Staff position in June 2018. (*Id.*) When the federal government eventually began an investigation of Madigan, prosecutors offered Defendant an immunity deal: Defendant would testify truthfully about Madigan's activities in exchange for immunity from criminal charges based on that testimony. (*Id.* at ¶¶ 4–8.)

Under this agreement, Defendant testified before a grand jury panel on March 31, 2021. (*Id.* ¶¶ 7–8.) During Defendant's testimony, counsel for the government asked him repeatedly about interactions between Madigan and Illinois Representative-turned-lobbyist Michael McClain. (*Id.* ¶¶ 1, 8.) As charged in the Indictment, seven of Defendant's answers regarding Madigan and McClain were knowingly false; as a result, the Indictment alleges that Defendant committed both perjury and obstruction of justice. These charges are based on the following seven question-and-answer segments, which the parties refer to as Episodes 1–7:

**[1]** **Q**: Okay. Did [McClain], after he retired, kind of give you any insight into what his interactions with [Madigan] were that you weren't privy to personally?

**A**: No, that wouldn't–that wouldn't happen.

**[2]** **Q**: Okay. And [McClain] didn't—wouldn't tell you what he was discussing with [Madigan] or anything that he was doing on behalf of [Madigan] in that '17, '18, and '19 timeframe?

**A**: No.

**[3]**    **Q**: Do you have any knowledge about whether or not [McClain] performed any sort of tasks or assignments for [Madigan] in [the] 2017 to 2018 timeframe at all?

**A**: I don't recall any.

**[4]**    **Q**: . . . Do you have any reason to think [McClain] was acting as an agent for [Madigan] after he retired in 2016, that is, doing work for him or carrying out assignments for him?

**A**: I'm not aware of any. I'm not aware of that activity. Let's put it that way.

**[5]**    **Q**: . . . [A]ll these questions are going to be for the 2017 through 2019 timeframe. Do you recall anyone ever describing any work–anyone at all describing any work or assignments [McClain] was performing on [Madigan]'s behalf?

**A**: I don't recall that–that I would have been part of any of that dialogue. I don't know why I would be.

**Q**: The answer is yes or no to that question. Do you recall?

**A**: No, I don't recall any of that.

**[6]**    **Q**: . . . So one of the things we were trying to figure out, Mr. Defendant, is whether or not–kind of a key issue for us is whether or not [McClain] acted as an agent for [Madigan] in any respect, including that timeframe. We're talking about the 2017, 2018, 2019 timeframe. Are you aware of any facts that would help us understand whether or not, in fact,

[McClain] acted as an agent or performed work for [Madigan] or took direction from [Madigan] in that timeframe?

**A**: I don't know who you would go to other than [Madigan] and [McClain]. [Madigan], if he had people do things for him like I did things for him, was—didn't distribute information freely.

**[7]**   **Q**: Let's talk about 2017, 2018 to the present, do you know [McClain] to have acted in any capacity as a messenger for [Madigan] to convey messages to and from him?

**A**: I'm not aware of any.

Contesting the allegations that these statements constituted perjury and seeking to strike other allegations included in the complaint, Defendant filed the Motion to Strike, Motion for Disclosure, and Motion to Dismiss. Both the Motion to Strike and the Motion to Dismiss are addressed in turn.

## II.   DISCUSSION

### A.   Motion to Strike Surplusage

Defendant's first motion requests that the Court strike "surplusage" from the Indictment under Rule 7(d) of the Federal Rules of Criminal Procedure, which provides "a means of protecting the defendant against immaterial or irrelevant allegations in an indictment . . . [,] which may, however, be prejudicial." *United States v. Andrews*, 749 F. Supp. 1517, 1518 (N.D. Ill. 1990) (quoting Fed. R. Crim. P. 7 advisory committee's note to subdivision (d)). But the Court may do so "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and

prejudicial." *See id.* at 1518–19 (cleaned up). This standard has been described as "rather exacting," and "only rarely has surplusage been ordered stricken." *Id.* at 1519 (cleaned up). Defendant argues that the portions of the Indictment that refer to the immunity agreement that governed his grand jury testimony are irrelevant and prejudicial. (Dkt. 30 at 3–6.)

### 1.    Relevance of Allegations

In its response to the Motion to Strike, the government offers several reasons why Defendant's immunity agreement is relevant to his perjury charges.[2] First, the government argues that the existence of the immunity agreement shows Defendant's knowledge that his testimony was false, because as part of the immunity deal, he was admonished by the Chief Judge that he had to tell the truth. (Dkt. 39.) It is true that an admonishment from the Chief Judge would emphasize for a witness the importance of telling the truth. But a witness before a grand jury is already under oath. Accordingly, although the existence of the immunity agreement may be modestly relevant to showing Defendant's knowledge, its marginal benefit is slight in view of other readily available proof. *See Old Chief v. United States*, 519 U.S. 172, 184–185 (1997).

Mention of the immunity agreement is also necessary, the government suggests, to show the jury that Defendant was not forced to testify in violation of his Fifth Amendment privilege. (*Id.* at 23.) But the government does not tie this to the

---

[2] To convict a defendant of perjury, the Government must show "that (1) the defendant, while under oath, testified falsely before the grand jury; (2) his testimony related to some material matter; and (3) he knew that testimony was false." *United States v. Gorman*, 613 F.3d 711, 716 (7th Cir. 2010) (citing 18 U.S.C. § 1623).

elements of perjury in any way, and the argument thus cannot establish relevance. In addition, the government argues that the immunity agreement goes to show the materiality of Defendant's grand jury statements. After all, the argument goes, the government would not have offered immunity to a witness whose testimony would not be meaningful to the case. (Dkt. 39 at 21–22.) But this explanation, too, is weak. What is at issue in a perjury charge is not the anticipated materiality that motivates prosecutors to strike an immunity deal, but the actual materiality of the statements in the case in which they were made. *See United States v. Akram*, 152 F.3d 698, 700 (7th Cir. 1998) ("Material statements are those that have a natural tendency to influence, or are capable of influencing, the decision of *the decisionmaking body to which it was addressed*.") (emphasis added). As a result, the immunity agreement is only trivially relevant to that analysis.

More persuasive is the government's contention that the immunity agreement is relevant to prove Defendant's knowledge that his statements were false. According to the government, signing the agreement in advance gave Defendant ample time to prepare and firm up his answers. (Dkt. 39 at 22.) Defendant signed the immunity agreement about two weeks before he testified before the grand jury, thus making it more likely that Defendant was both motivated and able to consider his answers and ensure their accuracy. To be sure, the grand jury subpoena six weeks earlier (Dkt. 2 ¶¶ 4–5) also gave Defendant notice that his answers needed to be true and accurate. But the immunity agreement, which protected Defendant from prosecution (the grand jury subpoena offered no such protection), undoubtedly gave him further

6

incentive to strike a balance between complying with the agreement and avoiding incriminating his former employer. Signing two weeks in advance gave Defendant ample time to strike that balance. In this regard, the immunity agreement amply clears the low bar for relevance. *See Andrews*, 749 F. Supp. at 1519.

Finally, the government contends that the immunity agreement is relevant to explain why Defendant repeatedly answered questions with "I do not recall." (Dkt. 39 at 21–22.) As the government argues, Defendant found himself in a difficult position: he did not want to testify truthfully about McClain and Madigan, but he could not invoke the Fifth Amendment privilege because he had signed an immunity agreement. When faced with potentially incriminating questions, therefore, Defendant claimed not to remember—a difficult assertion for the prosecutor to disprove. Because the immunity agreement explains why Defendant answered questions in an allegedly perjurious way, the immunity agreement clears the low bar for relevance.

### 2. Prejudicial Effect

Relevance aside, mentioning the immunity agreement creates a risk of prejudice to Defendant. As with an arrest record, an immunity agreement can create the inference that the witness did something illegal in the past and is likely to do something illegal again. *See Thompson v. City of Chi.*, 722 F.3d 963, 977 (7th Cir. 2013) ("In general, a witness's arrest record will not be admissible, either because it is inadmissible character evidence under Rule 404(b) or because it is substantially more unfairly prejudicial than probative under Rule 403."). Yet an immunity

agreement is not as explicitly suggestive of potential criminal conduct crime as an arrest record. Either way, though, any material a defendant seeks to have stricken from an indictment is likely to be prejudicial; why would a defendant waste the effort on a motion to strike nonprejudicial material? Justification for a motion to strike surplusage cannot be found merely because the allegations at issue are unfavorable.

Unlike an arrest record, which often can be excluded because it goes merely to attack a defendant's character (arrest records do not equate to convictions), an immunity agreement can be relevant to an underlying and related charge of perjury. In this case, the immunity agreement is not wholly irrelevant to the underlying crime of perjury; on the contrary, it is substantially relevant. Balancing that relevance against the immunity agreement's potential prejudicial effect, the Court finds that any potential prejudice is insufficient to justify striking the challenged material from the Indictment. Defendant's motion to strike is therefore denied.

### B.  Motion to Strike Parts of Count I

#### 1.  Dismissal under *Bronston*

Defendant has also moved to dismiss portions of the Indictment under *Bronston v. United States*, 409 U.S. 352 (1973). In *Bronston*, the Supreme Court held that when a witness gives a literally true but misleading answer, he cannot be charged with perjury; the remedy for a misleading answer is for the attorney to ask more specific answers in the moment, not for the government to punish an evasive witness after the fact. *See id.* at 357–58. Courts have since extended *Bronston*'s

immunity from criminal charges to witnesses answering "fundamentally ambiguous" questions. *See Gorman*, 613 F.3d at 716.

The mere presence of some ambiguity, however, is insufficient to defeat a perjury charge. Rather, where a perjury charge is based on the answer to a slightly ambiguous question, a conviction may still be upheld "if a jury has been called upon to determine that the question as the defendant understood it was falsely answered." *Id.* (cleaned up). Put differently, whether a prosecutor can bring a perjury charge turns on whether the questioning at issue was "fundamentally ambiguous" or capable of comprehension by the witness.

To determine whether a question is "fundamentally ambiguous," the Seventh Circuit employs a reasonableness analysis. As another court in this Circuit has recently described, where the question's ambiguity is "only arguable, . . . then it must go to a jury for a credibility determination." *United States v. Nash*, No. 21-CR-105-JPS, 2022 WL 1004205, at *3 (E.D. Wis. Apr. 1, 2022). It is only where persons of "ordinary intellect could not agree as to its meaning, or if it would be impossible for the questioner and answerer to come to a mutual understanding," that an answer cannot form the basis of a perjury conviction under *Bronston. Id.*; *see United States v. Ilic*, No. 07CR522, 2008 WL 192319, at *1 (N.D. Ill. Jan. 23, 2008) (cleaned up) ("Whether a question is fundamentally ambiguous is for a jury to determine, unless the district court is convinced that the context in which the questions were asked rendered them incapable of reasonable comprehension.").

Beyond the reasonableness test, the Seventh Circuit has never defined "fundamentally ambiguous." But in other circuits, courts have identified "a number of factors to consider when assessing fundamental ambiguity, including: (1) the inherent vagueness—or, conversely, the inherent clarity—of certain words and phrases, (2) the compound character of a question, (3) the existence of defects in syntax or grammar in a question, (4) the context of the question and answer, and (5) the defendant's own responses to allegedly ambiguous questions." *United States v. Strohm*, 671 F.3d 1173, 1179 (10th Cir. 2011).

Defendant points to four questions in Episodes 1–7 that he contends were fundamentally ambiguous: Episodes 3, 4, 5, and 6. Defendant asserts, based on this alleged ambiguity, that his answers could not have been perjury and thus should be stricken from the Indictment.[3] For the sake of completeness, the Court considers each under both the Seventh Circuit's reasonableness standard and the multifactor approach applied in other circuits.

---

[3] Defendant also argues that his answers to two of these questions are literally true and cannot violate the perjury statute. (Dkt. 30 at 9–10.) But his answer to those questions was "I don't recall." Whether Defendant did, in fact, recall answers to either of those questions at the time of his grand jury testimony is a quintessential jury question. Defendant's response that "the government has produced no evidence to Defendant to establish otherwise" is of no moment. *See United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010) (courts considering the sufficiency of an affidavit "do not consider whether any of the charges have been established by evidence or whether the government can ultimately prove its case"). Although the government has statutory and constitutional obligations to produce exonerating evidence, it has no affirmative duty to turn over its entire case-in-chief. *See United States v. Sanders*, 207 F. App'x 651, 654 (7th Cir. 2006). Accordingly, Defendant's literal truth argument supplies no basis for striking this portion of the Indictment. At the close of the government's case-in-chief, if Defendant still maintains that no evidence exists to show that his statements of "I don't recall" were false, then he may raise that issue in a motion for judgment of acquittal under Rule 29.

10

### a. Episode 4

Defendant first points to the question in Episode 4: "Do you have any reason to think Mr. McClain was acting as an agent for Mr. Madigan after he retired in 2016, that is, doing work for him or carrying out assignments for him?" Defendant's response to this question was: "I'm not aware of any. I'm not aware of any of that activity. Let's put it that way."

This question was not so ambiguous that it was incapable of comprehension. Indeed, although the question was broad, its meaning is reasonably clear. Counsel for the government wanted to know whether Defendant had any reason to believe McClain was acting as an agent for Madigan. And if this raised any questions, the prosecutor then clarified that, when he said acting as an agent, he meant "doing work for him or carrying out assignments for him." Particularly because Defendant was Madigan's Chief of Staff, he could reasonably have understood what "doing work" or "assignments" would mean. Defendant fails to offer any alternative interpretations of the question. Accordingly, it is unlikely that this was a circumstance in which "it would be impossible for the questioner and answerer to come to a mutual understanding," *Nash*, 2022 WL 1004205 at *3, as the Seventh Circuit's precedent requires.

Applying the multifactor test of other circuits does not yield a different result. As explained above, the phrasing of this question is not inherently vague; although Defendant argues that "agent" is a vague term, any vagueness is cured by the government's clarifying second clause. And despite Defendant's contention to the

11

contrary, the question is not compound. It asks only one question: whether McClain was acting as Madigan's agent. The second clause does not add a second question. It narrows the definition of agency to include two possible behaviors—doing work or carrying out assignments. There were no obvious grammatical or syntactical errors that could change the meaning of the question. Although the first part of Defendant's answer does not perfectly match the question ("I'm not aware of any"), the next sentence makes clear that he knew the government was asking about interactions between Madigan and McClain ("I'm not aware of any of that activity.").

Because Episode 4 does not contain a fundamentally ambiguous question under either standard, the motion to strike it from the Indictment is denied.

### b.    Episode 6

In Episode 6, the prosecutor asked Defendant the following question:

> So one of the things we were trying to figure out, Mr. Defendant, is whether or not—kind of a key issue for us is whether or not Mr. McClain acted as an agent for Mr. Madigan in any respect, including that timeframe. We're talking about the 2017, 2018, 2019 timeframe. Are you aware of any facts that would help us understand whether or not, in fact, Mr. McClain acted as an agent or performed work for Mr. Madigan or took direction from Mr. Madigan in that timeframe?

Defendant replied, "I don't know who you would go to other than Mr. Madigan and Mr. McClain. Mr. Madigan, if he had people do things for him like I did things for him, was—didn't distribute information freely."

Under the Seventh Circuit's reasonableness analysis, this question is clear enough to go to the jury. Breaking the paragraph down makes clear why. Critically, the first two sentences of the paragraph were not questions at all—they gave context for the witness. The first sentence explains the government's reasoning: they were

trying to determine whether Madigan and McClain had an agency relationship. The second sentence narrows down the timeframe: the question applies only to 2017–2019. And the third sentence presents the question: "Are you aware of any facts that would help us understand whether or not, in fact, Mr. McClain acted as an agent or performed work for Mr. Madigan or took direction from Mr. Madigan in that timeframe?" This question asks whether McClain was working on Madigan's behalf in any way. Particularly because, as shown in Episode 4, the term "agent" had been defined as "doing work" or "carrying out assignments" for another person, a reasonable witness could have understood the prosecutor to have been, again, clarifying agency with the terms "performed work for" and "took direction from." As with Episode 4, Defendant fails to suggest an alternative meaning for this question, further showing that Defendant and the prosecutor each understood the question.

Applying the multifactor test of other circuits leads to the same result. Nothing in the language at issue was especially vague. Defendant again points to the use of the term "agent" as creating uncertainty. But this only emphasizes that the prosecutor had offered phrases to clarify what "agent" meant at least twice in the questioning. As the prosecutor said in Episode 4, to be an agent meant "doing work for [someone] or carrying out assignments [for them]." In Episode 6, the prosecutor used the similar description of "work[ing] for [someone] or t[aking] direction from" them. This consistency significantly reduced any risk from the imprecise word "agent."

13

Defendant also argues that the question was compound, but the Court disagrees. Government counsel's final clauses "or performed work for Mr. Madigan or took direction from Mr. Madigan in that timeframe?" are definitions of acting as an "agent," not separate questions.

Finally, Defendant argues that his answers prove the question was ambiguous because his statement "I don't know who you would go to other than Mr. Madigan and Mr. McClain" was nonresponsive. That answer, however, was entirely responsive. Government counsel asked whether Defendant himself was aware of any information about the relationship between McClain and Madigan. Defendant's response—while again imperfect—states that he does not know of anyone who would know about that relationship other than McClain and Madigan.

Episode 6's colloquy was permissible under both the Seventh Circuit's reasonable interpretation test and the multifactor test used in other circuits. Accordingly, the motion to strike Episode 6 from the Indictment is denied.

### c.     Episodes 3 and 5

Defendant makes his last fundamental ambiguity arguments about Episodes 3 and 5 together, so the Court considers them together as well. As with Episodes 4 and 6, these questions are similarly broad but not impermissibly vague. In Episode 3, the prosecutor asked Defendant: "Do you have any knowledge about whether or not McClain performed any sort of tasks or assignments for Madigan in [the] 2017 to 2018 timeframe at all?" Next, in Episode 5, the prosecutor asked: "Do you recall anyone ever describing any work—anyone at all describing any work or assignments

14

McClain was performing on Madigan's behalf?" To each, Defendant answered that he did not recall.

Neither of these questions is so ambiguous that it would fail the Seventh Circuit's reasonableness test. In Episode 3, the prosecutor was asking whether McClain performed tasks or assignments for Madigan in the 2017 timeframe. "Tasks" and "assignments" are both common terms—especially for Defendant, who was Madigan's Chief of Staff. Similarly, Episode 5 asked whether other people had told Defendant that McClain was doing "work or assignments" on Madigan's behalf. This, too, was a clear question. As for the multifactor test, Defendant's primary argument for ambiguity seems to be that the words "tasks," "work," and "assignments" were impossibly vague. But he fails to point to even a single alternate definition to any of these terms that would lead to confusion.

Under existing Seventh Circuit precedent and the multifactor test used by other circuits, these questions are not ambiguous enough to warrant removing them from the jury's consideration. Accordingly, the motion to strike Episodes 3 and 5 from the Indictment is denied.

### 2.     Dismissal under Rule 7(c)

At the close of his motion to dismiss, Defendant argues that the last allegation in Count One of his Indictment "fails to set for the precise falsehood alleged and the factual basis of its falsity[] and must be stricken." (Dkt. 33 at 12.) Under Rule 7(c) of the Federal Rules of Criminal Procedure, the indictment or information "must be a plain, concise, and definite written statement of the essential facts constituting the

offense charged . . . ." Fed. R. Crim. P. 7 (c)(1). As the Seventh Circuit has explained, an indictment "is legally sufficient if it (1) states all the elements of the crime charged, (2) adequately informs the defendant of the nature of the charges against him, and (3) allows the defendant to assert the judgment as a bar to future prosecutions of the same offense." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013). In considering a motion to dismiss, courts should not "review the contents in a hypertechnical manner but rather on a practical basis and in their entirety" to determine whether these three elements are met. *United States v. Burke*, No. 19-CR-322, 2022 WL 1970189, at *12 (N.D. Ill. June 6, 2022) (cleaned up). In so doing, courts must take the allegations in the indictment as true and view them in the light most favorable to the government. *Id.*

Defendant seeks to strike the following statement from the Indictment: "MAPES provided [McClain] with messages communicated to MAPES by [Madigan], including messages concerning work and assignments [McClain] was performing on behalf of [Madigan] between 2017 and 2018." Defendant appears to contend that this statement fails to "state the elements" of perjury as required under *Vaughn* because this allegation does not contradict any of his statements in Episodes 1–7 and so cannot form the basis of a perjury charge. The Court disagrees.

In Episode 4, Defendant stated that he was "not aware of any" "reason to think [McClain] was acting as an agent for [Madigan]," where "acting as an agent" was defined as "doing work for him or carrying out assignments for him." If Defendant was, in fact, "provid[ing] [McClain] with messages communicated to [him] by

16

[Madigan], including messages concerning work and assignments [McClain] was performing on behalf of [Madigan]," this would directly contradict Defendant's response to the question in Episode 4. Accordingly, the motion to dismiss this portion of the Indictment is denied.

## III.   CONCLUSION

Defendant's Motion to Strike and Motion to Dismiss are denied.

SO ORDERED in No. 21 CR 345.

Date: July 24, 2023

_____

JOHN F. KNESS
United States District Judge

17