UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.   21 CR 345 |
| v. | ) | Hon.  John F. Kness |
| | ) | |
| TIMOTHY MAPES | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits the following sentencing memorandum. The government respectfully represents as follows:

## PRELIMINARY STATEMENT

Defendant Timothy Mapes lied in the grand jury to protect two of his closest friends and confidants, former Speaker of the Illinois House of Representatives Michael Madigan and Michael McClain. Mapes' lies were calculated to thwart the government's sprawling investigation of a series of unlawful schemes calculated to corrupt the government of this State at the highest levels. The criminal activity was pervasive and long-lasting, and involved bribes to Madigan that were calculated to reap benefits for Commonwealth Edison ("ComEd"), AT&T, and other entities and individuals, as well as for Madigan himself. The relationship between Madigan and McClain was material to the investigation. Mapes faced no personal legal exposure if he testified truthfully. After he asserted his Fifth Amendment privilege, he was immunized, and faced no risk of criminal prosecution. Yet he chose to willfully

obstruct the investigation and not to reveal what he knew about the relationship between Madigan and McClain. Mapes denied knowledge, or claimed not to remember, to protect his former boss, Madigan, and Madigan's close associate, McClain. Mapes' grand jury testimony obstructed the government's investigation, and the integrity of the grand jury process, both of which rely on witnesses' truthful testimony.

Even now, after a jury convicted Mapes of both perjury and obstruction of justice, and of every single false statement listed in the indictment, Mapes still refuses to accept responsibility for his actions. He instead blames the government for not presenting him with more information when he repeatedly (and falsely) asserted a lack of memory before the grand jury. As a result of Mapes' crimes, the government respectfully asks the Court to sentence the defendant to a term of imprisonment within the applicable Guidelines range of 51 to 63 months.

## **BACKGROUND**

In the spring of 2021, a federal grand jury was conducting an investigation focused on Madigan, the former Speaker of the Illinois House of Representatives, and Madigan's efforts to accept and solicit bribes from businesses and individuals in Illinois. At that time, Madigan had not yet been criminally charged. The focus of the investigation was no secret though. In November 2020, McClain, Madigan's friend and a former state legislator, was indicted (along with three others) for McClain's role in coordinating corrupt payments from ComEd to Madigan. After McClain's indictment, the grand jury continued to investigate Madigan's bribery and McClain's

2

role in arranging other bribes on Madigan's behalf. One aspect of the grand jury's investigation concerned gathering evidence about and establishing the nature of the relationship between Madigan and McClain, and their participation together in the unlawful activity.

Mapes served as Madigan's Chief of Staff for approximately 25 years and was a member of Madigan's close inner circle until Mapes resigned in June 2018. Mapes was thus uniquely positioned to provide information about Madigan, as well as about Madigan's relationship with McClain. Based on dozens of recordings and other evidence, the government knew that Mapes also was close friends with McClain and that Mapes had direct knowledge of Madigan's use of McClain as an agent to perform sensitive tasks. Mapes' first-hand knowledge thus would have been useful to the grand jury's investigation and to the government's prosecution.

### Mapes' Interview and Immunization

On February 11, 2021, the government questioned Mapes during a proffer-protected interview, with two defense attorneys present. During the interview, Mapes was asked numerous questions about Madigan's relationship with McClain. Tr. 588-91. Thus, prior to his appearance in front of the grand jury, Mapes was not only fully aware that a major indictment had been returned against his friend, McClain, alleging that he had been acting on behalf of Madigan, but he also knew from the questions that were posed during his interview that the government was keenly interested in the nature of that relationship.

On February 12, 2021, after that interview, Mapes was served a subpoena to testify in the grand jury. Tr. 615. Through his defense attorney, he refused to testify by asserting his Fifth Amendment privilege against self-incrimination. Owing to his assertion of his Fifth Amendment privilege, before Mapes' grand jury appearance, Chief Judge Rebecca Pallmeyer entered an order granting Mapes derivative use immunity pursuant to 18 U.S.C. § 6002. GX 422. On the morning of his grand jury testimony, March 31, 2021, Mapes appeared before Chief Judge Pallmeyer in person, and Chief Judge Pallmeyer admonished Mapes that the order required him to testify truthfully before the grand jury and that, if he failed to do so, he could face prosecution. GX 423.

**Mapes' Lies in the Grand Jury**

Mapes was immunized before his grand jury appearance yet, despite this protection, Mapes chose to lie repeatedly in the grand jury when asked broad questions about Madigan's relationship with McClain and the work McClain did for Madigan from 2017 to 2019. Mapes claimed not to recall the work McClain performed for Madigan from 2017 to 2019; any instance when McClain passed messages for Madigan during that period; or any conversations McClain had with Madigan. GX 1, GX 424 at 69, 73, 79, 115-16, 120, 122.

Mapes' motive for lying was obvious. Mapes wanted to protect his long-time boss, Madigan, as well as his friend McClain, and ensure that he could never become a witness at a criminal trial. After having been compelled to testify despite his assertion of his Fifth Amendment privilege, Mapes relied on "I don't remember" or "I

don't recall" responses in an effort to make it appear he was fulfilling the immunity order when, in fact, Mapes knew the answers and refused to provide them. Below are just some of the lies Mapes told in the grand jury. Throughout his testimony, Mapes' goal was to ensure that the government did not learn any useful or new information involving Madigan, McClain, and their relationship to one another.

### Mapes' Lies About McClain's Work for Madigan

Mapes lied multiple times about his knowledge of Madigan's interactions with McClain and the work and assignments Madigan gave McClain from 2017 to 2019. Dkt. 125. Mapes claimed that McClain would not have told him anything he discussed with Madigan and that Mapes did not know whether McClain did any work for Madigan during that timeframe. *Id.* This was plainly false.

The government presented dozens of exhibits showing that McClain and Mapes discussed Madigan's interactions with McClain at length, in the context of, among other things, sexual harassment allegations in Springfield, leadership appointments, committee appointments, and political fundraising. *E.g.,* GX 36, GX 66, GX 72, GX 73, GX 75, GX 282, GX 375, GX 374, GX 376, GX 380. The trial testimony made clear that Mapes knew McClain worked for Madigan, which McClain referred to as his "assignments." Indeed, McClain told Mapes so in multiple calls. *E.g.,* GX 3, GX 17, GX 51, GX 57, GX 58. Mapes himself relayed to McClain assignments from Madigan while Mapes was Madigan's Chief of Staff. GX 7, GX 251, GX 294. In addition, multiple witnesses testified about McClain's work as Madigan's agent, including former Representative Greg Harris, former Representative Lou

Lang, Representative Bob Rita, and lobbyists and former Madigan staff members Tom Cullen, Will Cousineau, and Craig Willert. McClain's role as Madigan's agent was well known within the corridors of power in Springfield and yet Mapes, Madigan's own chief of staff, pretended he was a potted plant with little to no knowledge of McClain's true role. Mapes' lies to the grand jury were brazen and obvious and designed to ensure the government did not get any useful information from him and that he was not called as a witness despite having valuable information.

### **Mapes' Lies About Passing Messages**

Mapes also lied when he claimed not to be aware of whether McClain acted as a messenger for Madigan in 2017 or 2018. Dkt. 125. The evidence at trial showed that Mapes was well aware of McClain's role as a messenger for Madigan. *E.g.,* GX 265, GX 70, GX 78.

As an example, Mapes lied about the interactions McClain had with former Representative Lou Lang from 2017 to 2019. GX 424 at 112-113, 114-15. In the fall of 2018, McClain asked Lang to resign from public office on Madigan's behalf, after accusations of misconduct had been leveled against Lang. This brewing scandal was big news, and McClain kept Mapes filled in every step of the way. GX 16, GX 57, GX 368, GX 369, GX 58, GX 59, GX 60. McClain told Mapes, "I gotta tell [Lang] that he's gotta move on. That the has no future in the House." GX 60. Mapes joked, "Will you be wearing your big boy pants that day?" GX 60. After McClain had finished the job, McClain advised Mapes that Lang would step down from office and would advise Madigan of his decision to step down. GX 66.

**Mapes' Lies About Communications Between McClain and Rita**

Mapes told similar lies when he was asked about Representative Rita. McClain worked with Rita for years on gaming legislation, at Madigan's request. In the grand jury, Mapes claimed to have no idea whether McClain interacted with Rita between 2017 and 2019. GX 424 at 114. But Mapes was well aware of McClain's assignment to work with Rita on gaming. *E.g.,* GX 8, GX 57; Tr. 276-292 (testimony of Rita). Mapes and McClain had multiple conversations about McClain's work with Rita on gaming legislation. *E.g.,* GX 8, GX 84.

**Trial**

On August 24, 2023, after nearly three weeks of trial, a jury returned guilty verdicts on both counts of the indictment and decided that the government had proved each specified false statement and each matter defendant lied about in each count. Dkt. 124, 125.

## SENTENCING GUIDELINES CALCULATION

### I. Summary of Guidelines Calculation

The government's proposed Guideline calculation is summarized below, and discussed in more detail in the sections that follow:

Total Offense Level:                    **24**

- Base offense level **6** under U.S.S.G. §§ 2J1.2(c), 2J1.3(c), 2X3.1(a)(1), 2C1.1(a)(2)

- **+2** under U.S.S.G. § 2C1.1(b)(1) (more than one bribe)

- **+14** under U.S.S.G. §§ 2C1.1(b)(2), § 2B1.1(b)(1)(H) (value of payments between $550,000 and $1,500,000)

- **+4** under U.S.S.G. § 2C1.1(b)(3) (elected public official)

- **-2** under U.S.S.G. § 4C1.1 (zero-point offender)

Criminal History Category:        **I**

Advisory Guidelines Range:        **51 to 63 months' imprisonment**

### II. Offense Level Calculations

#### a. The Bribery Guidelines Apply.

Guidelines §§ 2J1.2(c) and 2J1.3(c) provide that, for perjury and obstruction of justice convictions related to "a criminal offense, [the Court should] apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than" the base offense level of 14 set forth in § 2J1.2(a) and § 2J1.3(a).[1] This provision "serves as a tool for calculating the base offense level for particularly serious obstruction offenses." *United States v. Russell*, 234 F.3d 404, 410 (8th Cir.

---

[1] Pursuant to Guidelines §§ 3D1.2(b), (c), and (d), Count One and Count Two are grouped.

2000). *See also* U.S.S.G. § 2J1.2, Background Commentary ("Because the conduct covered by this guideline is frequently part of an effort . . . to assist another person to escape punishment for an offense, a cross reference to § 2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person."); U.S.S.G. § 2J1.3, Background Commentary (same principle applies to perjury).

The government is not required to prove that the defendant was actually an accessory to the underlying offense. *Russell*, 234 F.3d at 410; *United States v. Martinez*, 106 F.3d 620, 622 (5th Cir. 1997) (collecting cases). Instead, the Court must apply the underlying offense Guideline, "plus any applicable specific offense characteristics of [the underlying] offense that were known, or reasonably should have been known by [the defendant]." *United States v. Shabazz*, 263 F.3d 603, 608 (6th Cir. 2001) ("Because Shabazz's offense involved obstructing the prosecution of a criminal offense, the court was then *required* to determine the offense level under the cross-referenced Accessory After the Fact guideline, U.S.S.G. § 2X3.1. . . ." (emphasis added)). If the government makes this showing, "[a]pplication of the § 2X3.1 cross-reference provision is mandatory." *United States v. Kimble*, 305 F.3d 480, 486 (6th Cir. 2002).

Here, Mapes' false grand jury testimony related to an ongoing criminal investigation into the conduct of Madigan and McClain. Accordingly, the accessory-after-the-fact guideline, Guideline § 2X3.1(a)(1), applies, and the base offense level is

"6 levels lower than the offense level for the underlying offense." U.S.S.G. § 2X3.1(a)(1).

The underlying offense that the grand jury was investigating included allegations that Madigan was engaged in bribery. The bribery Guideline, which is § 2C1.1(a)(2), provides for a base offense level of 12, less 6 under Guideline § 2X3.1(a)(1), which results in a base offense level of 6. PSR ¶ 32.

Mapes acknowledges that he knew about the bribery investigation involving Madigan (after all, it was meticulously detailed in the indictment which was public before Mapes testified) but argues that "mere awareness" is not sufficient to constitute relevant conduct. Def. Version of the Offense at 9 (citing *United States v. Presendieu*, 880 F.3d 1228, 1246 (11th Cir. 2018)). That is not the correct standard for a perjury and obstruction case, as discussed above. Mapes plainly knew, or reasonably should have known, the investigation concerned bribery when he testified. *See Shabazz*, 263 F.3d at 608.

Indeed, there is compelling evidence that Mapes was aware of the nature of the investigation. He emailed McClain about the deferred prosecution agreement between the government and ComEd just days after the filing became public on July 17, 2020. GX 418. In the deferred prosecution agreement, ComEd agreed to pay a fine of $200 million on account of its participation in the illegal bribery and admitted that the value of the benefit received by the company was more than $150 million. *United States v. Commonwealth Edison Company*, No. 20 CR 368 (N.D. Ill.) (Kness, J.) [Dkt. 3 at 6-7; *id.* at A-12].

Mapes knew about the indictment of McClain and three other ComEd executives and lobbyists in November 2020, approximately four months before Mapes testified. The McClain indictment detailed numerous alleged bribes and explained that the bribes totaled at least $725,000. *See* GVO Ex. B (indictment in *United States v. McClain et al.*, No. 20 CR 812 (N.D. Ill.) (Leinenweber, J.)).

Mapes testified before the grand jury that he knew about the indictment and had read press about the investigation. *See* GX 424 at 34, 92-93, 141, 143-144. This testimony was consistent with numerous email exchanges between Mapes and others (including McClain) about the criminal investigation and demonstrates that Mapes was well aware of the public aspects of the investigation. *See* GX 393 – GX 396, GX 398, GX 402 – GX 404, GX 406 – GX 410, GX 415, GX 418.[2]

### b. The Following Specific Characteristics Apply.

Mapes is assigned certain offense level enhancements because he knew the underlying bribery scheme that the grand jury was investigating involved—at a conservative minimum—more than two bribes totaling more than $550,000 and less than $1,500,000. Specifically, pursuant to Guideline § 2C1.1(b)(1), a 2-level increase

---

[2] Mapes may argue that his false testimony did not adversely affect the government because Madigan was ultimately charged. That is both inaccurate, for the reasons stated above, and in any event, irrelevant. *See United States v. Gallimore*, 491 F.3d 871, 876 (8th Cir. 2007) ("A number of circuit courts have concluded that the cross reference provision is more concerned with a defendant's intent to obstruct a criminal proceeding than his ultimate success in doing so" (collecting cases)). Moreover, even though Madigan has been charged, Mapes has successfully prevented himself from being called as a useful inside witness in that case by lying under oath about his knowledge. By falsely claiming a total lack of knowledge, Mapes has prevented the government from calling a key witness who could establish McClain's role as an agent, as well as Madigan and McClain's association-in-fact for purposes of the racketeering conspiracy charged in Count One of the indictment. *See United States v. Madigan et al.*, No. 22 CR 115 (N.D. Ill.) [ECF #37] (superseding indictment).

is appropriate because the underlying offense involved more than one bribe. In addition, pursuant to Guideline § 2C1.1(b)(2) and § 2B1.1(b)(1)(H), a 14-level increase is appropriate, because the value of the payments was known or reasonably known to be more than $550,000 and less than $1,500,000.[3]

The evidence establishes by a preponderance that Mapes knew, or at a minimum reasonably should have known, (i) that the investigation involved more than one bribe; and (ii) that the value of the bribe payments was at least approximately $725,000. As discussed above, the indictment in the *McClain* case set forth in detail the numerous bribe payments made to Madigan associates, for a total of at least $725,000. *See* GVO Ex. B.

In addition, under Guideline § 2C1.1(b)(3), a 4-level increase is appropriate because the offense involved an elected public official, former Speaker Michael Madigan.

Mapes receives a 2-point reduction in the offense level because he has zero criminal history points and meets the other criteria set forth in the new zero-point offender guideline, Guideline § 4C1.1.

---

[3] This is a *very* conservative assessment, because the public information available to Mapes before his testimony, which he acknowledged he was familiar with, was that the benefit to be obtained by ComEd easily exceeded $100 million. *See* Guideline § 2C1.1(b)(2) (referencing benefit to be obtained from bribery). Mapes knew that Madigan and McClain had been implicated in a massive bribery scheme that had resulted in a $200 million fine paid by ComEd.

**ARGUMENT CONCERNING 18 U.S.C. § 3553(a) SENTENCING FACTORS**

Title 18, United States Code, Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.[4] In order to determine the sentence, the Court must consider the statutory factors listed in 18 U.S.C. § 3553(a)(1)-(7). For the reasons set forth below, consideration of the § 3553(a) factors reflects that a sentence within the Guidelines range is warranted and necessary.

A. The Nature and Circumstances of the Offense

The nature, circumstances, and seriousness of the offense favor a sentence within the Guidelines range. *See* 18 U.S.C. § 3553(a)(1) & (2)(A). The public's expectation that witnesses appearing before a grand jury will testify truthfully is a fundamental linchpin of federal law enforcement. Witnesses who lie during a grand jury investigation not only violate their solemn oath to tell the truth, but also impede the grand jury's ability to gather evidence.

Judge Sara Ellis addressed this very concern during a sentencing hearing for defendant Beena Patel, a former Cook County employee, after Patel was convicted of committing perjury before the grand jury to hinder a public corruption investigation:

---

[4] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

> If people believe that they are above the rule of law, the entire foundation of our democracy grinds to a halt and everything disappears. The only way our democracy works is if people believe that when they have issues, when they've been wronged, when something has happened to them, they don't take up sticks or knives or baseball bats or guns but instead can look to the Government and have the Government speak on their behalf, speak on behalf of the people, and look and seek justice.
>
> If that doesn't work, if people don't have faith in that system anymore, then what happens is what we see happening in Chicago all the time when gangs decide that they don't trust the government, that they don't trust the police, and they take the law into their own hands. That's just a small example of what happens when people believe that the rules don't apply to them and the law doesn't apply to them and you can go in and that oath is meaningless.

*United States v. Patel*, 17 CR 297 (N.D. Ill.) (Ellis, J.) (transcript of 12/12/19 hearing at 24) (imposing a 24-month sentence).

The crime is particularly egregious for a defendant, like Mapes, who worked at the highest levels of state government and was responsible for faithfully serving the people of the State of Illinois. When a long-time public servant makes the calculated and deliberate decision to lie in the grand jury, the criminal justice system, and our entire democracy, is threatened. Mapes' loyalty to Madigan and McClain did not override Mapes' obligation to tell the truth. Mapes well knew that his lies would impact a significant public corruption investigation, and yet he decided to take matters into his own hands by concealing what he knew. Mapes' false testimony was an assault on the truth-finding function of the grand jury in this case and the justice system in general.

Mapes' crime is even more serious because he did not face any risk when he testified. He had immunity. He was retired. He faced no risk of violence. In that sense, he is unlike many witnesses who testify in the federal courthouse in Chicago, who take seriously their oath to tell the truth, even in the face of real risk to their and their families' lives. Our criminal justice system relies on witnesses who tell the truth, even under difficult circumstances. But Mapes flouted that oath, and thought himself to be above the law.

Mapes continues to argue that his lies did not relate to material matters. This argument contradicts the jury's unanimous finding that all of the lies charged in Count One were material, even if the questions did not specifically concern bribes. *See also United States v. Wesson*, 478 F.2d 1180, 1181 (7th Cir. 1973) ("[F]alse testimony is material if it relates to any subsidiary issue properly under consideration by the grand jury even though it may not be directly connected to the primary subject of investigation."). Mapes' lies were critical to the relationship between Madigan and McClain. Former FBI Special Agent Brendan O'Leary confirmed that Mapes was an important witness, since he was a member of Madigan's "tight inner circle" and had worked as Madigan's Chief of Staff for 25 years. Tr. 427. Law enforcement was "interested in finding out whether Mr. McClain was being used by Speaker Madigan to carry out or to convey or communicate certain messages" (Tr. 421), the very topic that Mapes lied about in the grand jury. GX 424 at 73. O'Leary testified that Madigan and McClain's relationship and communications were important to the grand jury because Madigan had not been indicted when Mapes testified: "[Madigan] had a very

tight circle of people around him. He utilized Mr. McClain as sort of a go-between to take his orders and dole them out to the people, the end users. So, the communication between Mr. McClain—Mr. Madigan and his inner circle was extremely important to us. And the case was ongoing. We still had more to do." Tr. 425-26. Information from members of the inner circle, like Mapes, was particularly important because Madigan did not use his own email or cellphone to communicate; he instead relied on trusted agents, like McClain, to carry out his orders. Tr. 427-28. *See also* Tr. 702 (testimony of FBI Special Agent Ryan McDonald).

Although the government was not required to prove that the testimony actually impeded, interfered with or influenced the grand jury (*United States v. McComb*, 744 F.2d 555, 563 (7th Cir. 1984)), Mapes' lies *did* affect the grand jury's investigation by depriving the grand jury of a witness with inside information of Madigan and McClain's relationship. Had Mapes been honest, he would have provided useful information about Madigan's inner circle and his relationship with McClain, and he likely would have been a witness in the racketeering conspiracy and bribery case against Madigan and McClain. As noted above, Mapes could have provided insider testimony establishing Madigan's and McClain's association-in-fact with respect to the racketeering conspiracy charge, and further could have helped establish McClain's role as Madigan's agent, who was trusted with the most sensitive of tasks. Instead, Mapes denied basic facts to minimize his knowledge of the relationship. Mapes' lies thwarted the government's effort to gather that insider information.

Given Mapes' egregious lies and flagrant disrespect for the grand jury process, this Court should send a clear message to anyone, such as the defendant, who seeks to thwart, by lying under oath, the investigation and prosecution of public servants who abuse their positions of trust.

B. <u>History and Characteristics of the Defendant</u>

Mapes' lies were a continuation of 25 years of loyal service as Chief of Staff to Madigan, in which his job was to protect Speaker Madigan at all costs. Tr. 267 (Representative Rita describing the relationship between Madigan, Mapes, and McClain as a "pyramid," with Madigan at the top and Mapes and McClain as the points of the triangle). Mapes had no legitimate reason to lie, given that he had immunity provided he tell the truth.

Mapes claims there is no evidence that he was involved in any of the underlying bribery conduct. Of course, Mapes' false testimony made it impossible to ever know the full extent of his knowledge of or involvement in the underlying bribery activity that was under investigation. The immunity bestowed on Mapes protected Mapes from any truthful disclosures he made but he chose to provide no information of substance at all.

Nevertheless, Mapes is wrong to suggest there is no evidence that reflects that Mapes was read into certain aspects of the bribery scheme involving ComEd. As one example, the coconspirators who arranged the bribes to Madigan from ComEd described Mapes' knowledge of the bribery scheme. On February 11, 2019, McClain and co-conspirator John Hooker discussed renewing co-conspirator Jay Doherty's

17

contract for 2019, which included payments to so-called "subcontractors," who were, in fact, Madigan's associates indirectly paid by ComEd for no work. In that call, McClain reminded Hooker why the subcontractors were paid: "We had to hire these guys because Mike Madigan came to us. . . . it's that simple." Hooker boasted that the Doherty subcontractor arrangement was "clean for all of us." McClain spelled out the bribery arrangement: because the subcontractors were not paid directly by ComEd, they did not have to worry about whether the newest Madigan subcontractor, Mike Zalewski (a former Alderman and associate of Madigan's), was "doing any work or not." *Id.* Hooker laughed in agreement, and said, "That's right." McClain responded, "That's why we set it up like this, John." *Id.* Referring to the first "subcontractor" payments in 2011, Hooker stated, "We came up with this plan and between him, our friend, and, and, and, and, uh, *Tim*, and the alderman, they thought it was great." *Id.* (emphasis added). Hooker later said it again: "we came up with it but *they* thought it was great once they heard it." *Id.* (emphasis added). The phrase "our friend" was a coded reference to Michael Madigan that was employed by McClain, Hooker, and others. Mapes was the only member of Madigan's close inner circle with the name "Tim." This call, which took place as part of a covert wire interception, that is, when the speakers did not know they were being recorded, demonstrates that Mapes, as Madigan's right-hand man, knew about the corrupt arrangement to hide ComEd's payments to Madigan's associates, who were being paid in return for no work, and that Mapes thought it was a "great" idea from its inception in 2011.

Other evidence confirms that Mapes had an insider's view of Madigan's illegal conduct. When news of the government's investigation first broke, Mapes' foremost concern was shielding his boss from law enforcement scrutiny. Days after Mapes met with FBI representatives in Springfield on January 24, 2019 (which unbeknownst to Mapes was part of an unrelated investigation (GX 425)), the news broke that the government was investigating Madigan. Not only did Mapes speak to McClain on the day of the press coverage (GX 433), Mapes also told McClain about a conversation he had with Madigan's criminal defense attorney concerning the FBI meeting. GX 78. Mapes made it clear why he was giving this information to McClain; he was "reporting in" so that Madigan knew about his law enforcement contact. Mapes connected the FBI contact to "what's going . . . on in the Northern District," a reference to the government's investigation of Madigan. GX 78. The call thus showed that Mapes was read in when it came to the criminal investigation.

Mapes could not even manage to tell the truth about his interactions with Madigan's defense attorney. He claimed he just talked to Madigan's personal defense attorney for recommendations for counsel and for "informational" purposes because the attorney "might have perspective." GX 424 at 89-92. Mapes claimed he was just seeking his and McClain's "friendly advice." GX 424 at 102. Mapes even denied informing anybody in Madigan's orbit (which included McClain) about his contact with Madigan's defense attorney. GX 424 at 92. These were more lies. Mapes sought to "report in" to McClain and Madigan as confirmation of his loyalty.

Finally, the circumstances surrounding Mapes' abrupt retirement on June 6, 2018, after Mapes was accused of sexual harassment, are relevant history and characteristics under 18 U.S.C. § 3553(a). Specifically, independent investigator Margaret Hickey concluded that Mapes violated Speaker's Office policies by dismissing and mocking claims of sexual harassment in the Speaker's Office. GVO Ex. D at 3. After interviewing over 100 people who worked in the State Capitol, Hickey found Mapes' accuser, Sherri Garrett, to be "credible," including her claim that Mapes discouraged her "from coming forward with a concern about potential sexual harassment by insinuating that Garrett was raising the issue only because she was jealous of the attention" another female staff member received. *Id.* at 69; *see also id.* at 72, 79-80.[5] Hickey further concluded that Mapes had made inappropriate sexual comments to Garrett and other employees. *Id.* at 84.

Hickey's report also summarized the culture of fear and intimidation that Mapes fostered in the Speaker's Office. Employees felt they could be fired at will, and employees and elected representative alike reported that Mapes used derogatory, discourteous language towards them. *See, e.g., id.* at 74 ("Based on our investigation, we found sufficient evidence to conclude that Mr. Mapes had a habit of being

---

[5] Hickey concluded: "As a worker, Ms. Garrett did what any employer would want her to do: voice concerns regarding potential sexual harassment by someone in the workplace. In response, Mr. Mapes refused her privacy and belittled her claim by saying that there was nothing he could do about it. When Ms. Garrett pointed out that the issue was his concern, Mr. Mapes questioned Ms. Garrett's motivations for bringing the complaint and insinuated that she was jealous of the former legislative assistant's unwanted sexual attention from a representative." *Id.* at 80.

discourteous to workers and representatives" and "had a reputation for denigrating workers and threatening their jobs."); *id.* at 86 ("Mr. Mapes used fear to motivate.").

Hickey observed that many employees noted Mapes' strengths, including his "intelligence, efficiency, and work ethic," and his efforts to help and support employees. *Id.* at 85-86. But the core findings of Hickey's report demonstrate that, on multiple occasions, Mapes acted in violation of Speaker's Office policies and disrespected staff members. Hickey's findings paint a picture—consistent with Mapes' criminal conduct in this case—of a person whose sole focus was to promote himself and the Speaker, without respect for the interests of others. These are aggravating factors the Court should consider.

Insofar as the defendant points to his career in public service as a factor in mitigation, and has submitted letters of support from both family and community members that reflect positively on Mapes' character, the mitigating value of his service and these letters are substantially diminished by the culture of fear and harassment that Mapes fostered within the Speaker's Office, not to mention the nature and circumstances of the offense of conviction as described herein.

C. The Need to Reflect Seriousness of the Offense, to Promote Respect for the Law and to Provide Just Punishment

As the Supreme Court has explained, "[g]rand jury proceedings are constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes, and its constitutional prerogatives are rooted in long centuries of Anglo-American history." *Branzburg v. Hayes*, 408 U.S. 665, 687 (1972) (citation and quotation omitted). Indeed, the requirement of indictment by a grand

jury in the Constitution "shows the high place it held as an instrument of justice." *Id.* (quoting *Costello v. United States*, 350 U.S. 359, 362 (1956)). The grand jury's authority to subpoena witnesses not only has ancient origins, but is "essential to its task," for the grand jury has the right to "every man's evidence." *Id.* at 688 (citations and quotations omitted).

Mapes sought to pervert and thwart the function of this ancient instrument of justice and its quest to hear every person's evidence during a critical investigation involving a high-level public official. It is essential that this Court's decision promote respect for the law, and for the functions of the grand jury. A Guidelines sentence in this case will send an important message to those in Springfield and elsewhere within this State who still foolishly cling to Mapes' view that circling the wagons to "protect the boss" is acceptable—even if it means lying to federal law enforcement and the grand jury. This conduct will not be tolerated.

A stiff sentence, one called for by the Guidelines, is necessary to send the message that even the powerful and well-connected must abide by their duty to provide truthful testimony to the grand jury. A sentence below the Guidelines range would not promote respect for the law; rather, it would merely breed contempt for it, by suggesting that people who choose to ignore the law and lie under oath in public corruption investigations can simply get away with their crimes without facing any substantial punishment.

D. <u>The Need to Afford Adequate Deterrence</u>

Mapes' risk of recidivism is low given the near certainty that he will be never called to testify again—in an odd sense, his initial crime has prevented him from being called as a witness under oath. He should not get undue credit for making himself unavailable as a witness, however.

General deterrence remains an important consideration, as discussed above. The grand jury process, and our criminal justice system in general, relies on witnesses coming forward, often at great risk to themselves and their families, and telling the truth. A guidelines sentence will send the appropriate message that there is no place in the criminal justice system for those who lie under oath and obstruct federal investigations in order to protect corrupt public servants. As Judge Ellis put it in sentencing defendant Beena Patel, "there must be something beyond [a sentence of probation] so that people understand there is nothing more important that you can do as a member of our society than tell the truth." *United States v. Patel*, 17 CR 297 (transcript of 12/12/19 hearing at 68).

This case has received considerable public attention, and the sentence handed out by this Court will certainly receive significant public attention as well. The unmistakable message should be sent that those who lie to a federal grand jury will be held accountable, and that obstructing justice has devastating consequences and will result in a significant term of imprisonment.

23

E. <u>Need to Avoid Unwarranted Sentencing Disparities</u>

The government respectfully recommends that the Court impose a sentence within the applicable Guidelines range for another reason: sentencing within the advisory Guidelines enhances the fairness, integrity, and public reputation of judicial proceedings. The legislative history of the Sentencing Reform Act of 1984 explains why this is so. Prior to the adoption of the Guidelines, Congress studied the state of federal criminal sentencing and the indeterminate sentencing scheme then in place. Congress was not at all pleased with what it saw. The Senate Judiciary Committee concluded that the sentencing system in place prior to the Guidelines was unjust, because there was a "shameful disparity" in criminal sentencing, a disparity that resulted in similarly situated defendants receiving sentences that varied wildly depending on the judge they appeared before and the district they were tried in. *See* S. Rep. No. 98-225 at 38, 65, 98th Cong., 1st Sess., 1984 U.S.C.C.A.N. 3182, 3221, 3248, 1983 WL 25404 (1983). The Committee pointed out that "[o]ne offender may receive a sentence of probation, while another—convicted of the very same crime and possessing a comparable criminal history—may be sentenced to a lengthy term of imprisonment. *Id.* This system of indeterminate sentencing was considered neither fair to the offender nor to the public, because a sentence that was unjustifiably high compared to sentences received by other defendants was unfair to the defendant,

24

while an unjustifiably low sentence was unfair to the public. *Id*. at 39, 45, 1984 U.S.S.C.A.A.N. at 3222, 3228.

This district was singled out for its disparate sentencing practices. The Senate Judiciary Committee noted that, in 1974, the average federal sentence for bank robbery was eleven years, but in this district, it was five and a half years. *Id*. at 41, 1984 U.S.S.C.A.A.N. at 3224. The Committee also pointed to another study where 50 federal judges within the same circuit participated in a study where they were asked to indicate what sentence they would impose on a defendant, and the disparities in their decisions was "astounding." *Id*. As Senator Edward Kennedy, one of the co-sponsors of the Sentencing Guideline legislation, put it, "[f]ederal criminal sentencing is a national disgrace. Under current procedures, judges mete out an unjustifiably wide range of sentences to offenders convicted of similar crimes." 130 Cong. Rec. 1644, Volume 130, Part 2 (Feb. 2, 1984).

The Guidelines were thus promulgated in part to foster public confidence in federal judicial proceedings by ensuring that similarly situated defendants received similar sentences. In other words, the Guidelines were meant to ensure equal justice under law. It was clear to Congress that respect for the law "cannot flourish among convicted defendants or the public when justice is undercut by unequal treatment." H.R. Rep. No. 1017, 98th Cong., 1st Sess. 102, 31-32 (1983). It is for this reason that the Guidelines were implemented with bipartisan support—with Senators Edward

Kennedy, Joseph Biden, Strom Thurmond, and Richard Lugar among the co-sponsors of the legislation.

Since the United States Supreme Court rendered the Guidelines advisory, there has been a trend back toward the sentencing regime decried by the sponsors of the Sentencing Guidelines. In a report issued in January 2019, the United States Sentencing Commission determined that the deviations between sentences within judicial districts continue to grow and concluded that "[i]n most cities, the length of a defendant's sentence increasingly depends on which judge in the courthouse is assigned to his or her case." U.S. Sentencing Commission, "Intra-City Differences in Federal Sentencing Practices: Federal District Judge7s in 30 Cities, 2005-2017," at 7, 29 (Jan. 2019), available at www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190108_Intra-City-Report.pdf (last visited Jan. 29, 2024). In Chicago, the average percentage difference from the Guideline minimum for the period between October 1, 2011 and September 30, 2017 was -28.1 percent; in Phoenix, it was -10.1 percent; and in Dallas, it was -2.1 percent. *Id.* at 22, 39, 42, 53. In other words, the current post-*Booker* approach has yielded disparate sentences based not only on the judge assigned the case, but also on the district where the defendant is charged.[6]

Imposing a Guidelines sentence will serve the goal of ensuring similarly situated defendants receive similar sentences—regardless of where they are

_____

[6] An even more recent study conducted by the United States Sentencing Commission reflects that under the post-*Booker* approach adopted by the Supreme Court, there are now notable racial and gender disparities in terms of the sentences handed out in federal court. For example, from fiscal years 2017 to 2021, Hispanic females received sentences 27.8 percent

sentenced and what demographic they come from—and prevent the sentencing discrepancies that led to the Sentencing Guidelines in the first instance.

F. Supervised Release

The government agrees with Probation's proposed supervised release conditions. The government proposes Discretionary Condition Number 6 be amended to bar Mapes from meeting or communicating with both Madigan and McClain (or their representatives) until the underlying criminal cases against those two individuals have resolved.

G. Fine

The fine Guideline range is $20,000 to $200,000. U.S.S.G. § 5E1.2(c)(3). The assigned Probation officer informed the government that Mapes submitted financial information after the PSR was completed, and a supplemental report on his ability to pay a fine is forthcoming. The government will address the appropriate fine after review of any supplemental submission from the Probation Office.

## **CONCLUSION**

A sentence within the applicable Guideline range of 51 to 63 months is warranted after considering the factors outlined in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the history and characteristics of

---

longer than White females; females of all races were 39.6 percent more likely to receive a sentence of probation than a male; and Black males received sentences of incarceration that were 9.2 percent longer for fraud offenses than White males. *See* U.S. Sentencing Commission, "Demographic Differences in Federal Sentencing," Nov. 2023, at 4-5, 30, available at www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2023/20231114_Demographic-Differences.pdf (last visited Jan. 29, 2024).

defendant. This sentence is sufficient, but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Julia K. Schwartz*
        DIANE MacARTHUR
        JULIA K. SCHWARTZ
        Assistant United States Attorneys
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604
        (312) 353-5300