## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES | |
| v. | Case No. 21 cr 345 |
| TIM MAPES | Hon. John Kness |

### TIM MAPES' SENTENCING MEMORANDUM AND OBJECTIONS TO PSR

Tim Mapes is a good man. When considering the totality of his life, he will be known as a loving husband and father, a public servant, a proud American and Illinoisan, an extremely hard worker, and a selfless member of his community. He has spent decades working very hard (and expecting it of others) trying to make the State of Illinois better, fairer, and more compassionate to its citizens. When no one is looking, he is quick to offer a helping hand to those in need. His understated generosity and quiet compassion for others is evident, as chronicled in the more than 130 letters of support that we have shared with this Court.

Tim Mapes accepts the jury's verdict—though he disagrees with it and continues to maintain his innocence. He also continues to maintain that the government's evidence established, at most, that Mr. Mapes did

1

not recall conversations with Mr. McClain about legal activity from three years or more in the past (a) that were not material in a legal sense because they were not significant either to Mr. Mapes or to the government's investigation; and (b) for which Mr. Mapes was provided no opportunity to refresh himself—unlike (based on Mr. Mapes' investigation) almost every other witness with whom the government spoke in this investigation, all of whom were provided documents and played recordings in an effort to refresh their memories.

But it is undisputed that Tim has otherwise lived a law-abiding life, that he did not profit from the crimes the jury found him guilty of, and that he has suffered devastating consequences already as a result of this case. It also cannot be disputed that Tim's alleged crimes did not hinder the government's investigation—indeed, he was charged only with "attempted" obstruction in Count Two of the indictment. Tim and his family have been living under the cloud of this investigation and prosecution, and they continue to endure the stress, anxiety, significant financial pressures, and uncertainty that the criminal justice process entails.

The letters submitted by Tim's family, friends, and former colleagues depict a man who overcame very tough family circumstances as a child; worked extremely hard in service to the people of the State of Illinois for decades; developed a reputation for hard work, integrity, and looking out for the little guy; and created a wonderful and loving family. Tim is a rock of support to others—family, friends, and colleagues—and repeatedly goes out of his way (often quietly) in service of others. Tim has no prior criminal history and poses absolutely zero risk of danger to his community or recidivism.

Based on his history and characteristics, as reflected by his years of public service and the extraordinary support he has received from the community, and based on the criminal conduct at issue here, Tim Mapes is precisely the kind of person worthy of a non-custodial sentence by this Court. As one of his many supporters suggested via letter, we ask that when fashioning a sentence, you evaluate Tim based on the things he quietly did to help others with no expectation of reward. Those letters tell extraordinary stories of Tim doing just that, time and again.

On behalf of Tim, we respectfully submit that a sentence of time served, with a period of supervised release that would include a

substantial amount of community service, would be sufficient but not greater than necessary to do justice in this case. Such a sentence would constitute only a slight departure from the applicable guideline range of 10 to 16 months in Zone C. On the other hand, sending this nearly 70-year-old man to prison would achieve nothing more than to inflict undue additional suffering and hardship on Tim, his family, and his community.

Incarceration is not necessary in this case in order to achieve deterrence or to promote respect for the law. Tim respects the criminal justice process and accepts the jury's verdict, but he did not believe he was lying or obstructing the grand jury's investigation. Instead, he was being cautious and careful in his answers—as well he should have been, given the government's unique treatment of him both in the run up to his grand jury appearance and during that appearance. Neither through its arguments nor through its witnesses did the government identify any evidence that Tim had any knowledge of or participation in any bribery scheme involving Michael Madigan, Michael McClain, ComEd, or anyone else. It is also undisputed that Tim did not profit or benefit at all from his alleged crimes. To the contrary, from his unceremonious dismissal by Michael Madigan in 2018 to his prosecution here, the last five years have

constituted a half decade of misery for Tim and his family. Accordingly, a term of imprisonment is unnecessary to craft a fair and just sentence in this case.

## I. Tim Mapes' Personal History

The report by the probation office, and the letters submitted by Tim's family, friends, and former colleagues, demonstrate what a good, decent, caring, and honorable person Tim is. He is a selfless, humble, compassionate, and reliable family man. His entire career was devoted to public service—working behind the scenes to pass legislation that he thought bettered the lives of the citizens of Illinois. Along the way, Tim built a strong, loving marriage and family. He followed the lessons of commitment, hard work, and integrity he learned growing up on a farm in Western Illinois throughout his life.

### A. Childhood

Tim's approach to life was formed through his time growing up as a child on a farm in far western Illinois. Tim was the oldest of four children who grew up in Nauvoo—a small community on the Mississippi River near Fort Madison, Iowa. Tim learned the value of hard work early

on the family farm, and learned even then to speak plainly, and to listen more and talk less.

Tim's dad, Lloyd Mapes, died at a very young age. At just 16 years old, Tim became the man of the house, obligated to develop a maturity unique to boys that age. As his sister explained:

> Tim became very supportive and caring at a young age. Our father became ill and wasn't able to help around the farm. Tim being the oldest and able to drive, he was counted on more to help with the family as our mom spent days/nights working with my dad's health issues. He was needed and assisted in helping with the farm and shuttling siblings; helping maintain somewhat normal surroundings with the help of family and neighbors. He continued to be there for us through dad's illness and after his passing. My dad left my mother and four children ranging from 16 to ten. Through all the years my mom leaned on Tim as a male figure for the rest of us.[1]

Even when Tim went off to college nearby at Western Illinois University in Macomb, Tim routinely came home to help his mother and younger siblings and help out around the farm.

Tim's cousin also recalls how, at the tender age of 16, Tim took on such enormous family responsibility:

> When his father died at age 37 of a brain tumor I remember sitting at my uncle's funeral and watching Tim who was 16 years old at the time become the head of the family for his mother and his three younger siblings. Over the next 15 years he gave so much of his time

---

[1] *See* Group Exhibit A, attached hereto under seal, at p. 145, of letters in support of Mr. Mapes.

guiding the family the best he could during those difficult years. Tim has always found time to stay in touch with my mother (his father's sister) and has always shown a kind heart to so many in our family.[2]

Even now, Tim returns to the farm every Spring and Fall to help with the planting and harvest with Tim's stepfather, who continues to farm at the age of 87.

### B. Family

Tim and Bronwyn have been married for over 35 years. They are the proud parents of Devin Mapes and Corbin Mapes, both of whom have grown into mature, ethical, loving young men who have both devoted significant time to public service.

Devin is 34 years old. He and his wife are expecting their first child, and Tim and Bronwyn are excited to be grandparents for the first time. Devin is a practicing lawyer in Chicago, working in government. He previously served as an Assistant State's Attorney. Devin writes lovingly of his dad:

> It is nearly impossible to crystallize in a few pages the abundance of love, wisdom, and general guidance that Dad has provided my brother and me after nearly 35 years. . . He also has become one of my best friends, which I have discovered to be one of the great joys

---

[2] *See* Group Exhibit A, attached hereto under seal, at p. 157, of letters in support of Mr. Mapes.

of reaching adulthood. His impact on my growth and overall development as a person cannot be overstated.

Dad valued our honesty above everything else, but he also held himself to that same standard (To that point, he once refused to lie that Santa was real, instead opting just not to answer the question). . . . I have spent substantial amounts of time with him in both his personal and professional lives, and he always has prioritized honesty in everything he does. No employer, colleague, or professional affiliation could motivate him to abandon these principles. To me, he is, and always has been, an honest person.

Dad always found time to be involved in all activities in which his sons participated. To support his boys, he never missed a piano recital, tee ball game, school or community musical production, and local swim meets (and attended many non-local ones, too). He also rarely missed soccer matches, cross-country meets, triathlon events, and many other random "sons' activities" over the years. . . He often went straight back to the office after many of these events and stayed there until late, just to make up for the time he gave us while at these activities. And, he always was home for dinner, session and election periods notwithstanding. Despite his hectic schedule, we could not have asked for a more engaged father during our formative years.

I am who I am because of Dad. There is no person on this planet more singularly responsible for who I have become as a son, husband, future father, and overall person than him. . . I owe him a debt that I can never repay, but perhaps it should not be repaid. That debt is the product of a healthy, nurturing, three-decade-and-counting father-child dynamic, and it is precisely the impact that all fathers probably should have on their children. He set the standard for me, and I only hope that I can do the same for my child on the way. Love, courage, perseverance, and wisdom are hard to define, but who Dad is to me defines them well.[3]

---

[3] *See* Group Exhibit A, attached hereto under seal, at p. 83, of letters in support of Mr. Mapes.

Corbin is 30 years old. Tim and Bronwyn adopted him from the Philippines when he was five months old. Corbin too is in public service—he is an active-duty sailor with the United States Navy. Corbin is exceptionally proud of his father:

> With each opportunity my family has provided me in the United States, the feeling of gratitude I have for them has only grown, despite their insistence that I owed them nothing. Their love for me has been unconditional and this country has provided me opportunities which played a major role in feeling an obligation to serve it.

> [M]y father has been every bit the inspiration to me both in his family and work life. [H]e always taught me humility and made time for his family. The articles I read about my father from afar since 2018 paint him in such a different light than the man who raised me. One example of his humility was my realization that I had no idea of what his role as Chief of Staff entailed, nor of how many people he managed, until my first year at College at University of Illinois Urbana-Champaign. Not once growing up did he even hint at the breadth of responsibility he carried. Previously I never thought he was anything special or wielded significant authority because he taught me to be kind and respectful to all members of his office at the State Capitol. To me, that approach demonstrates humility, respect, and kindness. I was raised to be respectful to all, regardless of race and gender, despite being a minority in a predominantly white society where the reverse was not always true.[4]

---

[4] *See* Group Exhibit A, attached hereto under seal, at p. 76, of letters in support of Mr. Mapes.

Examples of Tim's quiet devotion to his family exist throughout the letters in support this Court has received. For instance, one decades-long friend describes Tim's commitment to family this way:

> Tim often made the two-and-one-half hour drive to his parents' farm in rural Nauvoo, Illinois for family matters, holidays, planting and harvest seasons and visits. When his mother received a devastating cancer diagnosis, Tim spent an enormous amount of time coordinating her medical care and was full-time with her in her final days. Since her passing in 2016, Tim has remained a constant presence and source of strength for his step-father John as he continues the operations of a 500 acre farm on his own.

> Unfortunately, John is recently showing signs of dementia and suffering also from the physical effects of a lifetime of manual labor and aging. Tim now is even more devoted to John and spends as much time as possible ensuring that John is safe, comfortable and has the assistance he needs. As the daughter of a mother who passed away from Alzheimer's, I am extremely familiar with the time and extraordinary amount of patience required to care for someone with this debilitating condition. Tim has risen valiantly to this challenge and his presence will be critical as John's health continues to decline.[5]

His cousin Cecile knows Tim as "a giving man who has a fun side and a serious side." He explained, regarding the "serious side" of Tim:

> When his mother was sick, he was there every spare moment he had to help her and his stepfather with farm chores, cooking, trimming shrubs and trees in their beautiful yard. When my own father had triple by-pass surgery, Tim drove up from Springfield for one reason only. He came to deliver flowers to my dad personally just days after he had returned from the hospital.[6]

---

[5] *See* Group Exhibit A, attached hereto under seal, at p. 14, of letters in support of Mr. Mapes.
[6] *See* Group Exhibit A, attached hereto under seal, at p. 11, of letters in support of Mr. Mapes.

Tim is the anchor of the family, and has served that role for decades. For his entire life—from his time as a young man in Nauvoo to today—Tim has gone out of his way selflessly to be there for others in his family and to support them.

## C. Community

The letters in support of Tim have multiple examples of his quiet good works on behalf of others. He is an exceptionally good neighbor and member of his community—a quality that has eroded substantially in communities and neighborhoods in modern day America. One woman remembered Tim with several examples of his kind, unselfish nature:

> One of my favorite times with Tim was at a local Springfield Sliders baseball game. Tim fast became "Uncle Tim" to my children, chatting away to them and repeatedly treating them to snacks that they would not have normally received. Several years later they would ask when they could go back to a Sliders game with him.

> Tim has been a mentor to my husband as he developed his career path, always looking out for him and supporting him along the way. Additionally, since I have returned to work Tim has advised me both professionally and personally on how to re-enter and handle the hurdles of the workforce.

> I recently ran into Tim and Bronwyn at the grocery store with my mother who unfortunately is suffering from dementia. Tim made a point to stop what he was doing, address my mother and engage her

with his quick wit. When he walked away, she asked who he was and mentioned how nice he was.[7]

Another friend recalled that "if my family was visiting, he would bake and deliver to the house several desserts for my entire family to enjoy." She also noted that Tim "took the time to travel to Wisconsin for my in-laws' funerals, just to be there for us." And, "[w]hen we moved back to Michigan . . . to be closer to my aging parents, Tim insisted on helping us load the U-Haul truck, as my husband can't lift heavy things." She summarized Tim's unselfish nature by adding," This is the type of person Tim is, always lending a hand and showing concern for other people."[8]

Another friend provided additional examples of Tim's service nature:

> Tim has been a positive force in my life. He has been a sounding board, an extra set of hands, home repair person, emergency childcare provider and my all-around cheerleader for well over 30 years.
>
> Perhaps selfishly, as I have come to rely on his help, I hope you will apply leniency to his sentence. When my youngest son was recently airlifted to a children's hospital out of town, Tim was the first person to reach out and volunteer to make the 4-hour round trip drive to bring my older son to visit. This is but one of many examples, from offering childcare so I could take advantage of an important work opportunity to helping to make essential home

---

[7] *See* Group Exhibit A, attached hereto under seal, at p. 72, of letters in support of Mr. Mapes.
[8] *See* Group Exhibit A, attached hereto under seal, at p. 4, of letters in support of Mr. Mapes.

repairs that saved our family money. As a working mom, Tim is an important member of my 'village.'[9]

Likewise, when another friend's grandmother from Iowa passed away while in Springfield, Tim immediately lent a hand:

> Tim arrived at the hospital at 6 a.m. so my mother and I would not be alone. I did not ask him to come. He wanted to help, and he did. Tim made the necessary calls and arrangements to spare us those tasks. Tim then drove a U-haul to Iowa. He packed up my grandmother's home and brought everything back to Springfield. I will always be grateful to Tim for his compassion, love, and friendship while helping me through these difficult times.

Tim is a sincere, unfaltering friend. He helps anyone, anytime.[10]

A Springfield acquaintance of Tim's described him this way: "I believe that we are evaluated by the things we quietly do to help others with no expectation of reward. Tim Mapes is a good man who assisted my family in many ways and never asked for anything in return." He added, "At a very low point in my life, Tim was interested in my opinion and treated me with respect."[11]

A neighbor shared this about Tim:

> My wife passed in December 2010, and Tim would inquire of my wellbeing from time to time, and took interest in seeing that I was staying active and social. In June 2022, I had open heart surgery, and Tim would check on me frequently, and ask if he could help in

---

[9] *See* Group Exhibit A, attached hereto under seal, at p. 67, of letters in support of Mr. Mapes.
[10] *See* Group Exhibit A, attached hereto under seal, at p. 99, of letters in support of Mr. Mapes.
[11] *See* Group Exhibit A, attached hereto under seal, at p. 39, of letters in support of Mr. Mapes.

any way. He offered to help with yardwork, and took pleasure in bringing me food items, which he himself prepared.[12]

A high school and college friend recalled Tim as "a loyal and trusted friend who went out of his way to support me in high school, college, and beyond." The friend provided two specific examples of Tim's selfless nature:

> Through college, Tim and I worked on a farm close to the university for added income. Tim grew up on a farm and I did not. Tim instructed me on the farming skills I needed to ensure I succeeded on that job. Tim also supported me in my premed studies and drove me to college classes daily, as I did not own a car.
>
> Tim also took the time to frequently visit my mother, who was widowed for many years. She greatly appreciated his company. Tim also visited my mom frequently when she was in hospice for six months prior to her death, nearly two years ago.[13]

These remembrances, and others like them, all point to an unassailable fact—Tim Mapes is a genuinely good and remarkable citizen and person who goes out of his way, when no one is looking, to help others, to mentor others, to care for others. He does so not for any reward, but because he believes it is the right thing to do.

---

[12] *See* Group Exhibit A, attached hereto under seal, at p. 123, of letters in support of Mr. Mapes.
[13] *See* Group Exhibit A, attached hereto under seal, at p. 121, of letters in support of Mr. Mapes.

### D. Career

Tim spent his entire career working as a public servant in Springfield, Illinois. He started in 1977, and retired at Michael Madigan's insistence on June 6, 2018.  Tim worked exceedingly hard to further the interests of the people of Illinois. As the letter writers attest, he seemingly worked harder than anyone else on staff. While doing so, Tim looked out for those on staff who worked with and for him. He mentored them, tried to model good behavior, and encouraged them always to spend time with family and loved ones.

Tim was not a policy guy. His role was to make sure, as best as possible, that the policies that the Democratic caucus championed became law. One thing Tim does not dispute about the government's presentation—it was his job to keep "the trains running on time." He was organized, and it was imperative for him to juggle an almost infinite number of competing interests while doing what he could to make sure that the objectives of the Democratic caucus were achieved. Some of the things he was proudest of included (in no particular order) the following:

- Hiring, mentoring, and professionalizing staff, and increasing salaries and benefits;

- Working on passage of civil union legislation;

- Moving the house bill process from a paper system to an electronic system;

- Working to restore the Illinois State Capital building;

- Working on passage of gay marriage legislation;

- Working on legislation to help crime victims, including carjacking legislation and gun safety legislation;

- Working on passage of the Equal Rights Amendment in Illinois;

- Working on changes to Human Rights Commission to accelerate process for those with sexual harassment and other discrimination claims;

- Working on passage of legislation concerning Higher Education improvements; and

- Working with chiefs of staff of each caucus in a bipartisan fashion to attempt to further the interests of the State of Illinois.

Several letter writers—both men and women—remembered Tim as a very good boss who expected quality performance and who worked very hard—often on the thankless task of corralling the Illinois House caucus.

What many of those letter writers also offered was a portrait of a man who tirelessly advocated for staffers and families. One former state representative made clear that Tim "never lost sight of the importance of

family, and the need for support in troubling times." That representative remembered:

> Tim would always try to accommodate legislators' family needs whenever they were involved at the Capital. Many times, Tim was more assistance to a grandparent, spouse or child than the legislator. Tim cared that everyone was treated fairly. Tim was always there whenever a personal emergency arose, family illness, accidents or family crisis. Tim would always be available and ready to assist if he could. The same man who told you NO in his operations of House rules would be the first to offer help if you or your family needed it. When my wife was undergoing life and death medical surgeries, Tim was either calling, or a call away if I needed him. Many times, on the House floor I would see Tim overwhelmed with details, keeping the wheels on the bus of the legislative bill machine, and he would stop to encourage or compliment an intern or House page doing their job. Tim cares deeply about his family. Tim's caring for his family reflects on how he treated other's families. Tim had no problem telling House leaders no, while also telling the interns what a great job they were doing.[14]

Another former colleague of Tim's on the Illinois House staff recalled how Tim "devoted a lot of energy to helping people rescue themselves from personal crisis situations." Rather than cutting people loose, this former colleague described multiple situations where Tim's quiet intervention helped co-workers get better and lead productive, successful lives—both personally and professionally. This former colleague opined, "I am of the belief that someone with a more rigid

---

[14] *See* Group Exhibit A, attached hereto under seal, at p. 10, of letters in support of Mr. Mapes.

business style would see the person cut loose."[15] Tim did not. Instead, he saw the good in people and tried to help them as best he could when their lives and careers were in peril.

Another former colleague who reported to Tim talked about an early dinner they had with their wives shortly after the letter writer arrived in Springfield:

> At that dinner, he did not talk with me about my job duties or try to impress me with war stories. Instead, he focused on my and my family's well-being. He told me that the five years I would spend in that position would be time-consuming and arduous, but I should always make a point to find time for my family and take care of myself. And even though we did not know each other well at that point, Tim also told me I should let him know if the work ever became overbearing.
>
> Though his promise came true, and my position was often an 18- to 20-hour-a-day job, Tim constantly checked in on my well-being and emphasized the importance of getting away from the job at times and making sure to attend to my family. He got to know my wife and kids, always remembered my children's birthdays,[16] offered advice on school and activities for my young children, and reiterated that kids grow up fast and, no matter how busy you are, you will regret not making time for them. In these moments I would see a caring, compassionate side to Tim that few were privy to seeing.[17]

---

[15] *See* Group Exhibit A, attached hereto under seal, at p. 16, of letters in support of Mr. Mapes.
[16] While the Court and the government might see this reference as evidence of Tim's infallible memory, in fact Tim kept detailed written notes of people's important milestones (birthdays, anniversaries, children's names, etc.), examples of which were among the documents the Government produced in this case.
[17] *See* Group Exhibit A, attached hereto under seal, at p. 41, of letters in support of Mr. Mapes.

A letter writer who worked for Tim for over 20 years spoke effusively about his mentorship of and care for others:

> At work it seemed like Tim was always giving someone an opportunity to lead a project or excel as a member of staff, guiding them to become more effective in their roles or leaders themselves. I would think it would be hard to count the number of people who have directly benefited from his guidance and tutelage over the years.
>
> Watching Tim handle situations with empathy and understanding taught me more than I can express about how to be a leader and a good man. I can think of many times when the circumstances should have called for someone to be disciplined or even let go, and yet Tim found a way to not only turn the situations around but allow those involved to learn from their mistakes and give them a second chance. Many went on to bigger and better things and I only hope that they remember the stumbles along the way and who was there to help them get back up. That kind of caring and concern for those around him while dealing with the pressures of his various roles and positions shows me the kind of man that he is.[18]

One of the many ways that Tim has had a quiet, but hugely significant, imprint on the State of Illinois is in his behind-the-scenes work on the restoration of the Illinois State Capitol building. Many letter writers praised Tim for his work on that project. True to his humble nature, it is notably not something he mentioned to the Probation

---

[18] *See* Group Exhibit A, attached hereto under seal, at p. 112, of letters in support of Mr. Mapes.

Department (or, even, his own lawyers). One letter writer described Tim's efforts this way:

> One of the things for which Tim earned my admiration is that he was the upfront driving force in the restoration of the State Capitol building. This has been a years-long project that is still ongoing. Tim deserves credit for his work in initiating the project and moving it along. It is transforming the Capitol complex into a beautiful, yet functional, symbol of democracy for the people of Illinois. It will be appreciated for generations to come both by schoolchildren and other visitors to the Capitol and by those who work in the building.[19]

Another letter writer who faced obstacles traversing the Capitol specifically mentioned Tim's compassionate outreach:

> When I was a low level state agency liaison to the Illinois General Assembly, Tim apparently noticed my struggles to overcome obstacles in my wheelchair at the Capitol and on the House floor when most people would choose not to notice or even look away. When he was placed in a position of authority over the remodeling of the House Chambers he quietly and without any grandiosity took pains to approach me and ask my opinion on how it could be done in such a way as to remove obstacles and make it as accessible as possible.[20]

All of those letter writers (and others who are worked with Tim in Springfield and also shared their thoughts via letter) paint a portrait of Tim that is far different from that which the jury heard. One former

---

[19] *See* Group Exhibit A, attached hereto under seal, at p. 40, of letters in support of Mr. Mapes.
[20] *See* Group Exhibit A, attached hereto under seal, at p. 107, of letters in support of Mr. Mapes.

colleague (who had worked with him for decades) remembered when Tim

was selected to be the Speaker's scheduler:

> This was an extraordinarily difficult job—everyone wanted to see the Speaker about something, and there weren't enough hours in the day. Tim had to juggle countless requests, and maintain order . . . in other words, a thankless job. Not long after he assumed the role, then-State Representative John Cullerton gave Tim the now-infamous (thanks to truly misleading media coverage) "No One Gets in to See the Wizard" poster. The gift was meant to throw some humor on the impossible nature of the job Tim had, not some pronouncement of power as the media portrayed it.

> After I retired . . . in 2014, Tim helped me plan a memorial service for a friend we had both known since those early days on the House Democratic staff because her family did not have the ability to host or organize the event. We worked on the invitation, the menu, the list of speakers, the centerpieces, the final toast to her memory. We gathered emails to send the invitation. Tim sweat all the details on this event (like he did for every task he undertook) because he wanted whatever he was working on to be done well, and he wanted a perfect sendoff for his dear friend.

> Over the decades, I have seen what a good man he is, and I have witnessed the many good things he has done for many people.[21]

Tim's departure from public service was not as he intended or

planned. He was ousted by his boss, Michael Madigan, without any notice

or opportunity to be heard. Indeed, Tim's forced departure was exactly

contrary to how he treated those he supervised. Tim was chewed up and

---

[21] *See* Group Exhibit A, attached hereto under seal, at p. 127, of letters in support of Mr. Mapes.

spit out in an instant, all the more ironic after Tim had taken such pains *not* to do that for so many for so long who were under his charge.

### E. Post-June 6, 2018

Tim was crushed by his forced resignation. His wife testified at trial about how he responded over those first several months:

> He became very sullen, very depressed, isolative. It appeared as if he was lost. He spent much time in our—in fact, he spent all of his time in our furnished basement sitting in the dark. He was very confused.
>
> ***
>
> He was very depressed. He was very—he was in a dark place. He wasn't really—I worked—I was working during the day, so when I would come home, he was still in the same position, more or less, in the darkened basement than when I left him in the morning. And that speaks volumes to me.

Trial tr. at 1499. Tim's "energy level was low to non-existent." *Id.* at 1502. After several months, and with the prodding of his wife and loved ones, Tim went out "to find something to do to keep his mind occupied and to feel better about himself." *Id.* at 1503. He did a small bit of consulting and worked at UPS part-time on the overnight shift servicing the trucks that went out the following day to deliver packages. After a stint at UPS (and getting tired of "smelling like petrol", *id.* at 1504), Tim took a job as a driver transporting barge workers in Downstate Illinois.

Tim left behind the Capital and the hustle-bustle that had filled him for decades. He would still take calls from staffers and the odd legislator—but not Michael Madigan, who never sought Tim's counsel after June 6, 2018 or talked with Tim other than a perfunctory "hello" at a handful of gatherings they both attended. He still talked with Michael McClain on occasion during that post-June 6, 2018 time. While the government took pains to emphasize very short excerpts of their conversations, the full calls involved discussions of Tim's job search, family, travel, health issues, and politics. Trial tr. at 647-649. Not once did Tim Mapes and Michael McClain talk about McClain doing an assignment to get interns from the 13th Ward hired by ComEd. *Id.* at 649. Not once did Tim Mapes and Michael McClain talk about McClain doing an assignment to get ComEd to hire Victor Reyes' law firm for 750 hours per year. *Id.* Not once did Tim Mapes and Michael McClain talk about McClain doing an assignment to get ComEd to hire lobbyists that were close to Michael Madigan. *Id.*

## II.     Application of Section 3553(a) Sentencing Factors.

This Court is certainly familiar with Section 3553's instruction that sentences must be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing under 18 U.S.C. § 3553(a)(2). *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). Known as the "parsimony principle," the directive to impose no greater punishment than necessary "is an important and binding instruction from Congress." *United States v. King*, 861 F.3d 692, 696 (7th Cir. 2017); *see also United States v. Jordan*, 991 F.3d 818, 822 (7th Cir. 2021) ("Sentences must always conform to the 'broad command' of the parsimony principle"). Indeed, Congress has made clear that imprisonment is not always the appropriate sentence, but is merely one of many "kinds of sentences available" for this Court's consideration. *See* 18 U.S.C.§ 3553(a)(3). Further, Congress has directed that "the court, in determining whether to impose a term of imprisonment…shall consider the factors set forth in section 3553(a)…recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582.

Those factors, of course, include the history and characteristics of the defendant, the nature and circumstances of the offense, the need for

the sentence imposed, the kinds of sentences available, the sentencing guidelines range, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. On balance, the Section 3553(a) factors weigh against imposition of a term of imprisonment in this case. Instead, a sentence of time served and supervised release (with a significant portion of community service) is sufficient, but not greater than necessary, to fully satisfy the purposes of sentencing.

## I.   The history and characteristics of the defendant.

Those who have written letters on his behalf probably tell Tim's story best. Those who took the time to support him by writing letters are a cross section of family members, friends, former work colleagues, and former legislative officials. A few are household names.  Many more are simple, hard-working Illinoisans. All share a respect and admiration for the kind of person Tim is:

- "great father and husband"

- "loved working for Tim"

- Praising "his generosity and the confidence he had in me"

- "quite the listener"

- "He is amazing."

- "very thoughtful and kind hearted"

- "A good husband, father to two wonderful sons and friend to many"

- Noting "his many kindnesses"

- "personable, likeable, and reliable"

- "very devoted to his family and friends"

- "He was the person who showed me how to really work hard, how to listen to others, and how to expect the best from myself. I'm not sure I can properly express how fundamental Tim was to any growth for me in terms of responsibility, reliability, and determination."

- "you could call at any hour of the day, and he'd be there to lend a helping hand."

- "I love my family more than anything on earth, and I would trust Tim around them to this day."

- "A giving man"

- From a young staffer: "My Mom felt better knowing Tim was there looking out for me."

- "Patient and kind"

- "good moral compass"

- "a true gentleman"

- "genuinely cares for people"

- "his commitment to helping our society's most vulnerable has resulted in countless lives being changed for the better"

- "I was spiraling out, and Mr. Mapes saw something in me and his words and advice gave me the courage to not give up on myself or my career."

- "He was fundamental to my success. I will always appreciate Tim's friendship, guidance, counsel, and respect."

- "I do not wish for Tim anything more than what he himself afforded others when he was in a position to decide their fates. Rather than write off people who had committed serious mistakes or fallen considerably short of what was expected of them, Tim offered second (sometimes third and fourth) chances."

- "I can attest to his strength of character and compassion for others."

- "Tim's approach [to helping people] saved lives and families."

- "I have seen how Tim and Bronwyn have raised their children, instilling in them the same sense of intellectual curiosity, good manners, and importantly, providing them a strong moral compass"

- "decent, generous and caring family man"

- "He is one of the few—out of MANY former friends—who visits my husband in the nursing home often!!!"

- "Great boss"

- "Tim acted as a coach and mentor to entry-level employees. Tim encouraged them to be focused and to dress, talk and present themselves appropriately. He also stressed the

importance of education. Tim was kind of a father figure to them."

- "It is my hope that you consider all the young people who cut their teeth on the legislative staff and moved on to the private sector to lead very productive lives. All because Tim Mapes gave them a chance."

- "very family oriented."

- Describing "an act [by Tim] of pure kindness from an individual that cared."

- Describing a life of "integrity, honor, and character."

- "Tim has always helped people. Without regard to his own time/needs, he remains focused on helping others."

- "caring friend and leader"

- "Tim's compassion, funny, and kind heart made the years and many late session nights go by quickly. Simply put, Tim Mapes is the best boss I've ever worked for."

- "I count on Tim for advice."

- "helped provide me with . . . what I perceived at the time as a life changing act."

- "I have witnessed countless times Tim's compassion for others. Giving employees 2nd, 3rd, 4th, and sometimes 5th chances when they have messed up to do better, wanting everyone to succeed in life."

- "honest, hardworking . . . [but] always there for his family"

- "[H]e was instrumental in coordinating the passage of crucial legislative measures, including the Religious Freedom and

Marriage Fairness Act (Gay Marriage Act), amendments to the Illinois Human Rights Act which added sexual orientation as a protected class, the legalization of medical marijuana and the elimination of the death penalty in Illinois."

- "I have always been a very large girl, the kind that most boys made fun of. Yet, Tim always treated me with respect and friendship."

- Writing about "the gracious, kind man I came to know when I worked alongside him in Springfield and continuing through today"

- "one of the unsung worker bees that have made a true difference to the better for the lives of everyone in this State."

- "He has devoted his life to the service of Illinois."

- "Tim's generosity, empathy, and quick wit make him a unique individual"

- "When I started my career in government, it often was not easy being the only woman in a meeting. Tim never treated women differently than men in my experience. He only cared if you were competent and willing to work hard. He was always completely fair and honest with me."

- "Because of our friendship and my respect for his integrity, on multiple occasions, I asked Tim to meet and to talk with my two sons, and to provide each of them with some helpful career advice and counsel. On each and every such occasion, and without hesitation, Tim kindly agreed to do so, and was most generous with his time, attention, and advice."

- "really a great human being"

- "When my father died, Tim took time out of his life and planted a tree in my yard in memory of my dad."

- "In my dealings with Tim, whether job-related or personal, he has always been honest and forthcoming. Bottom line, Tim is a good man, a good husband to Bronwyn, and a good father to his sons Devin and Corbin."

- "forthright, dependable, and honest"

- "a consummate professional. Tim would always give you the bad news as well as the good. He was never a backslapper or glad-hander and never told people what they wanted to hear."

- "an honest leader of upstanding character . . . [who] has quietly and selflessly also helped some mutual friends."

- "extremely loyal, ethical, hardworking, detail oriented, and centered on family and faith."

- "He is a man of many admirable talents."

- "Tim is a person of great moral character, who has consistently shown a commitment to bettering the lives of those around him."

- Discussing Tim's "unwavering commitment to making a difference in the lives of others"

- "Tim Mapes was very professional and conscientious about doing the right thing in every way and expected nothing less of his employees."

- "One of the finest men I have ever known and probably the best boss I've ever had."

- "he never forgot where he came from"

- "he made you feel special when he stopped in for a visit."

- "My wife has been diagnosed with multiple sclerosis for over 35 years, in addition she has short term memory loss and resides in an assisted living facility. Tim and his wife on many occasions have visited and spent time with her at the facility and provided her with the strength to continue. For this I am profoundly grateful."

- "I quickly realized Tim was special."

- Tim "regularly showed kindness to me."

- "a dedicated and committed public servant" who "advocated [for an accommodation for the letter writer]"

- "He is the person who would contact a friend going through a divorce, he is the friend that would encourage you to apply for a job he heard was open, he is the friend that just wanted to help you have a better day"

- "I saw him coordinate having friends go to the hospital, in shifts, to stay with one of our colleagues who was dying of cancer."

Many of the stories in those letters reveal specifically Tim's service to others—whether back in Nauvoo, at the Capitol, or in his community. Tim's unsung efforts to help others are remarkable—particularly for a man who was holding down a very demanding, full-time job and leading his own family. The letters make clear that, even when no one is looking—and long before Tim ever had a thought of needing to marshal support in this Court—Tim has tried to help others (whether on the farm,

31

in his home, at work, or in the community). That is the real Tim, giving of himself to make others' paths smoother.

## II.    The nature and circumstances of the offense.

When considering the nature and circumstances of the offense, accepting the jury's verdict, we ask the Court to consider that (a) Tim's allegedly perjurious and obstructive testimony solely concerned legal matters; (b) Tim did not profit from this activity; (c) Tim did not interfere with the investigation; (d) Tim was treated differently than others who appeared before the grand jury (and, in some cases, who testified similarly about a lack of knowledge of criminal conversations between McClain and Madigan); and (e) the underlying bribery offense may actually not be a crime, pending the Supreme Court's decision in *Snyder*.

At the outset, it is important to note that the nature and circumstances of this offense—if this Court denies Tim's motion for acquittal and new trial—concern testimony about *legal* conduct that the FBI acknowledged it was not investigating. Tim has made those arguments in his motion for new trial, and incorporates those arguments here. But it bears noting that the testimony at issue here concerns events (like, for instance, whether Michael McClain had an "assignment" to talk

to Lou Lang about leaving the Illinois Legislature or whether Michael McClain had an "assignment" or "task" to make recommendations about House committee assignments) that were not investigated by the government and that did not provide the basis for any charges of anyone.

Tim was found guilty of committing perjury concerning approximately 7 questions of over 600 that were put to him in a long day before a federal grand jury. While the government claimed to the jury that Tim lied throughout his testimony, the truth is that the grand jury apparently did not agree with the government. He was not charged with lying about anything other than the 7 questions raised in Count One. More, there was much in Tim's grand jury testimony that was indisputably true and helpful to the government's investigation—as the government agents acknowledged at trial.

He was not a target of the investigation. Indeed, as government agents testified, there was no evidence that Tim had any knowledge of the ComEd bribery scandal or the Chinatown episode (other than a few second statement by Michael McClain at the end of a 17 minute conversation with Tim). In fact, the government agreed to immunize Tim—not something it is willing to do with a co-conspirator or co-

schemer.[22] He was a witness—and one who was years removed from Michael Madigan or his prior job as Chief of Staff. Tim did not profit at all from the criminal activity that brings him before this Court. To the contrary, he has lost. He has lost money, he has lost a reputation he spent decades building, and he has lost relationships.

Tim's conduct also did not interfere with the government's investigation. Revealingly, he is charged with attempted obstruction in Count Two of the indictment. And had the government truly wanted to probe Tim about his reactions to the recordings that the government had in its possession to further its investigation, it could have played him those recordings (or at least referenced particular conversations specifically in their questions)—as it did with almost every other witness it encountered in this investigation. Had Tim been refreshed, he likely would have told the grand jury what other witnesses implied or testified expressly to at trial: whatever Michael McClain said they took with a grain of salt, particularly as it related to Michael Madigan. For those

---

[22] And to be clear, Tim's counsel insisted on immunity—Tim himself did not. Counsel requested immunity solely because the government flatly refused to engage at all in a discussion with counsel about the topics they wanted to discuss with Tim, what if any concerns they had about him, and whether they would provide any documents and other information in order to help him best prepare himself to talk about events that had occurred many years ago. Such requests by counsel are, in the undersigned's experience (both as a prosecutor and now as a defense lawyer), standard parts of the dialogue process when representing a witness.

witnesses, it was Michael Madigan's words that counted—not what Michael McClain represented as Michael Madigan's words. Had Tim been refreshed, he also likely would have reiterated what he testified to at other points in his grand jury appearance: that Michael Madigan and Michael McClain talked privately about sensitive matters and he was not privy to it, and hadn't been for 20 years. Indeed, Tim's successor (and others close to McClain and Madigan) corroborated that very point in the grand jury, and none of them were charged with lying or obstruction.

Finally, the nature and circumstances of this offense are necessarily interwoven with the question currently pending before the Supreme Court in *Snyder*. We incorporate our arguments from that briefing here, but note that if either the underlying bribery convictions of the ComEd defendants or the Madigan racketeering case are compromised in any way by the Supreme Court's decision in *Snyder*, it will necessarily have an impact (at the very least) on the nature and circumstances of the offense here.

## III. The need for the sentence imposed.

Section 3553(a) discusses several factors to consider when the Court determines the need for the sentence imposed in a particular case. None of those factors compel a sentence of imprisonment here.

Tim has already been punished severely as a result of this offense. He has been unable to obtain more than entry-level delivery jobs, resulting in a family financial situation that is quite dire. Tim has also had to address the conduct he was accused of—with his family, his friends, and his community.

In addition, Tim has shown respect for the law since his arrest— satisfied completely his conditions of pre-trial release. Tim does not need imprisonment to deter him from future criminal activity or to protect the public. To the contrary, his family and his community will suffer in his absence. Tim is and has been a law-abiding citizen, and he will continue to turn this entire episode into a very hard-earned lesson as he moves forward in life.

A sentence of time served and supervised release (with a significant component of community service) would therefore promote respect for the law and provide just punishment—such a sentence would acknowledge

that justice does not require imprisonment in every instance for the commission of every crime.

Finally, Tim does not need educational, vocational, or other training that could be had in a correctional institution. He needs to get back to his family and his community, chastened by this very sobering experience but heartened by this Court's decision (hopefully) to put him on supervised release with community service and give him a second chance.

## IV. The kinds of sentences available and applicable sentencing range.

The advisory guideline range is but one of many factors this Court must consider when imposing a sentence that is "sufficient but not greater than necessary." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Indeed, the guidelines serve a limited function in sentencing after *Booker*. The guidelines are nothing more than a "rough approximation of sentences that might achieve Section 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109. The guidelines are not even considered presumptively reasonable at sentencing. *Gall v. United States*, 552 U.S. 38, 50 (2007). Congress has made clear that imprisonment—even when authorized by the guidelines—is not always the appropriate sentence. It is instead

merely one of "the kinds of sentences available" for this Court's consideration. *See* 18 U.S.C. § 3553(a)(3).

In this case, the parties disagree on the applicable range. Tim believes the appropriate Guidelines range is 10-16 months' imprisonment. That range is in Zone C of the Guidelines table (which expressly authorizes split sentences)—even before consideration is given to all of Tim's background and circumstances, his strong community ties, the non-violent nature of this case, Tim's first-time offender status, the fact that he did not benefit from the offense, and the other factors that point toward supervised release plus a significant amount of community service as a just sentence. A non-custodial sentence, then, would result in the most modest departure from the guideline range.

Mr. Mapes believes the following Guidelines apply:

i.    The base offense level is 14, pursuant either to Guideline 2J1.2(a) or 2J1.3(a).

ii.    The base offense level is decreased by two levels pursuant to the new Guideline section for first time offenders.

iii.    Criminal History Category. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the parties, defendant's criminal history points equal zero and defendant's criminal history category is I.

iv. Anticipated Advisory Sentencing Guidelines Range. The anticipated offense level is 12, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 10 to 16 months' imprisonment in Zone C, in addition to any supervised release and fine the Court may impose.

The government's proposed Guideline range is erroneous. The government version seeks to increase the applicable Guideline range to account for what the government contends is Mr. Mapes' awareness of ComEd's bribery scheme. But "mere awareness" is not sufficient. *See, e.g., United States v. Presendieu,* 880 F.3d 1228, 1246 (11th Cir. 2018) ("mere awareness" not sufficient to constitute relevant conduct).

Indeed, the government's own witnesses confirmed that their investigation did not reveal that Mr. Mapes had any involvement in either the bribery conduct that resulted in the ComEd indictment or in the bribery conduct that resulted in Mr. Madigan and Mr. McClain's indictment. Mr. Mapes has not ever been charged with conspiring with anyone to commit any crimes—nor did the government seek to elicit evidence at Mr. Mapes' trial under a theory that he conspired with others (including Mr. McClain or Mr. Madigan). In short, the government did not establish (and apparently does not believe) that Mr. Mapes participated in, counseled, commanded, induced, procured, or willfully

caused any relevant conduct as that term is understood in the Sentencing Guidelines. *See* Section 1B1.3. The government's attempt to pin bribery allegations to Mr. Mapes for purposes of calculating the sentencing range, then, is unavailing.

It is also disingenuous. Taking the evidence in the light most favorable to the government, the factual basis relevant to this case is – accepting the jury's verdict – that Mr. Mapes lied and attempted to obstruct the grand jury in connection with his answers to questions about the relationship between Mr. Madigan and Mr. McClain regarding *purely legal matters*. No evidence exists either in the grand jury transcript or in the government's presentation at trial that Mr. Mapes was asked about, was involved in, or knew about attempts to bribe Mr. Madigan by ComEd or anyone else or Mr. Madigan's acceptance of such bribes by ComEd or anyone else.

Importantly, *none* of the evidence the government presented at trial (or in its government's version) demonstrates that Mr. Mapes knew anything about bribes paid by ComEd—either in the form of ComEd's hiring of Mr. Madigan's associates as lobbyists for do-nothing ghost payroll jobs, allegedly at Mr. Madigan's behest; ComEd's hiring of Victor

Reyes' law firm for over 750 hours per year, allegedly at Mr. Madigan's behest; ComEd's hiring of interns from the 13th Ward in Chicago, allegedly at Mr. Madigan's behest; or the hiring of Juan Ochoa as a ComEd Board member, allegedly at Mr. Madigan's behest. The government's theory appears to be that ComEd did all of these things to bribe Mr. Madigan in order for him to support ComEd's legislative initiatives. But the government's *own witnesses* testified at trial that there was no evidence that Mr. Mapes had any involvement in any of that conduct. *See, e.g.,* Agent McDonald testimony at p. 634 (No evidence that Mapes had "anything to do with" Chinatown property); p. 649 (acknowledging no evidence of Mapes and McClain talking about any of the bribe conduct involving ComEd). Nor were there *any questions in the grand jury* to Mr. Mapes about those topics.

Indeed, the government itself in its closing argument walked away from claims that the grand jury investigation (and Mr. Mapes' alleged lies) were focused only ComEd. The government prosecutor instead argued:

> The first one is, what about ComEd? Is this case only about ComEd, what Mapes knew about it, and whether he was asked about it? It is not. It is not. None of the questions that are charged in this case by way of the indictment that were asked and charged in this case

41

. . . include the words ComEd at all.  The grand jury investigation was not limited to ComEd.

Trial transcript at 1848.  The prosecutor pointed out that the perjury case did not hinge on issues like bribery or other criminal activity. Instead, the prosecutor argued that the "key issue that we're looking at has to do with the agency relationship between Madigan and McClain." *Id.* at 1849. According to the prosecutor, Mr. Mapes was asked "specifically general questions . . . *not tied to ComEd." Id.* (emphasis added).  Finally, the prosecutor argued that "legal conduct can be absolutely material to the grand jury"—further confirming that Mr. Mapes' alleged perjury was not in answer to questions about bribery but instead about Mr. Mapes' recall concerning communications between Mr. Mapes and Mr. McClain about *legal conduct.* But, of course, even if Mr. Mapes had recalled in the grand jury Mr. McClain's statements about his alleged "assignments" for Mr. Madigan concerning, for example, taking to Sam Yingling, Mr. Mapes' testimony would not have furthered the investigation. Even if Mr. McClain had an "assignment" from Mr. Madigan to go talk to Sam Yingling about supporting Mr. Madigan for the speakership, such evidence would likely be inadmissible at any trial of Mr. McClain and Mr. Madigan. That is because it is propensity evidence. Further, evidence

42

that Mr. McClain did an "assignment" (McClain's words – not Madigan's) for Mr. Madigan on a purely legal matter establishes nothing on the core legal question of whether McClain and Madigan had a criminal conspiracy to accept bribes in exchange for passage of favorable legislation.

Separately, if the Supreme Court in *United States v. Snyder* limits the reach of the federal bribery statute in a way that impacts the prosecutions of the Com Ed executives separately charged by the government (or impacts the government's prosecution of Mr. Madigan), such a ruling would have a necessary and direct impact on the Sentencing Guidelines at issue in this case. Such a ruling would further confirm our view that no bribery enhancement should apply in this case.

This is not a case—like those contemplated by the Guidelines—where a witness testifies falsely that, for example, he was not driving the car that served as the getaway car for a bank robber. In that case, it would likely be appropriate for the Guidelines from the underlying offense (i.e. bank robbery) to apply. Nor is this a case—like those contemplated by the Guidelines—where a witness obstructs by, for example, hiding a family member who he knows is charged with a violent

federal offense. Again, in that circumstance, it would likely be appropriate for the Guidelines for the underlying offense to apply. Such is not the case here. Mr. Mapes was not questioned specifically (or even generally) about bribery allegations. Nor, as the government's own witnesses established, was Mr. Mapes inculpated in such conduct. Therefore, the bribery conduct engaged in by third parties should not constitute relevant conduct to Mr. Mapes. He should be sentenced using a straightforward perjury/obstruction Guideline.

## V. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Finding comparable cases to Tim's situation is somewhat difficult. The Northern District of Illinois average sentence for administration of justice crimes since 2015 is 8 to 13 months' custody:

**ADMINISTRATION OF JUSTICE CRIMES** (includes obstructing or impeding officers, contempt, obstruction of justice, perjury or subornation of perjury, bribery of a witness, impersonation, failure to appear by offender, failure to appear by material witness, commission of offense while on release, payment of witness, and misprision of a felony):[23]

| Year | NDIL average | 7th C average | National average |
|------|--------------|---------------|------------------|
| 2022 | 10 months (3 cases) | 16 months (13 cases) | 12 months (653 cases) |
| 2021 | 7 months (4 cases) | 9 months (14 cases) | 13 months (512 cases) |
| 2020 | 13 months (4 cases) | 10 months (18 cases) | 11 months (543 cases) |
| 2019 | 11 months (9 cases) | 11 months (28 cases) | 12 months (699 cases) |
| 2018 | 8 months (5 cases) | 11 months (25 cases) | 13 months (730 cases) |

---

[23] Data pulled from: https://ida.ussc.gov/analytics/saw.dll?Dashboard
.

| 2017 | 12 months (7 cases) | 13 months (20 cases) | 11 months (723 cases) |
| 2016 | 8 months (4 cases) | 11 months (24 cases) | 11 months (727 cases) |
| 2015 | 8 months (5 cases) | 19 months (23 cases) | 10 months (778 cases) |

What that data does not reveal is how many of those cases went to trial, and what the applicable Guideline range was. Here, Mr. Mapes went to trial (and therefore has not been afforded a reduction for acceptance of responsibility). In addition, the government seeks a Guideline range that is years above the average sentence imposed in this district over the last 10 years. We believe the sentencing range is 10 to 16 months.

Here, we do not know what the personal characteristics of other defendants are. Nor do we know the factual circumstances of their criminal activity—we do not know, for example, if those defendants were found guilty of obstructing justice or committing perjury concerning purely legal conduct. Nevertheless, the numbers here reflect that the sentence Tim requests is not out of the ordinary, and is similar to the sentences imposed on similar defendants.

Tim Mapes respectfully requests that the Court impose a sentence of time served with supervised release and a significant portion of community service. Tim's compelling life story, decades of public service, deep connections to his community, strong family ties and responsibilities, selfless good works and mentorship to others, and the nature of this particular offense all suggest that justice in this case calls for a non-custodial.

We thank the Court for its careful consideration of our request.

Dated: January 29, 2024            Respectfully Submitted,

                                   /s/ Andrew C. Porter
                                   Andrew C. Porter
                                   Katie Hill
                                   Salvatore, Prescott, Porter & Porter
                                   1010 Davis Street
                                   Evanston, IL 60201
                                   (312) 283-5711
                                   aporter@sppplaw.com
                                   hill@sppplaw.com

                                   *Attorneys for Defendant Tim Mapes*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on January 29, 2024, I caused copies of the foregoing to be served on all counsel of record by filing electronic copies with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF users.

/s/ Andrew Porter